1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

7

8

ELY CRAWFORD and AIMEE CRAWFORD, *individually and on behalf of their marital community*,

9

Plaintiffs,

10

vs.

11

RADIUS RECYCLING, INC. *fdba* SCHNITZER STEEL INDUSTRIES, INC.; TAYLOR MUNSON; KEVIN MCINTOSH, LACEY WESSON; JOHN DOES 1-10; AND COMPANY DOES 1-10,

12

13

Defendants.

14

15

16

17

18

19

20

21

Case No. 3:25-cv-05063

**COMPLAINT FOR DAMAGES**

JURY DEMAND

I. VIOLATIONS OF RCW 49.60 *et seq.* ("WLAD")
   A. HONORABLY DISCHARGED VETERAN DISCRIMINATION
   B. DISABILITY DISCRIMINATION
   C. HOSTILE WORK ENVIRONMENT
   D. DISPARATE IMPACT/TREATMENT
   E. FAILURE TO ACCOMMODATE

II. VIOLATIONS OF AMERICANS WITH DISABILITIES ACT ("ADA"), 42 U.S.C. §§12111, 12112, *et seq.*
   A. DISABILITY DISCRIMINATION
   B. HOSTILE WORK ENVIRONMENT
   C. DISPARATE TREATMENT
   D. FAILURE TO ACCOMMODATE
   E. RETALIATION

III. TORT OF OUTRAGE

IV. LOSS OF CONSORTIUM

22

Plaintiffs, ELY CRAWFORD and AIMEE CRAWFORD, by and through their attorney

23

of record, Elizabeth Lunde of the Law Office of Elizabeth Lunde, alleges the following claims

COMPLAINT FOR DAMAGES - Page 1

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

for relief against Defendants, RADIUS RECYCLING, INC. *fdba* SCHNITZER STEEL INDUSTRIES, INC., TAYLOR MUNSON, KEVIN MCINTOSH, AND LACEY WESSON ("Defendants"):

## I.    PARTIES

1.    At all times relevant to the factual allegations herein, Plaintiff ELY CRAWFORD ("Plaintiff or Ely") was a resident of Pierce County, Washington and is married to Plaintiff, Aimee Crawford.

2.    At all times relevant to the factual allegations herein, Plaintiff AIMEE CRAWFORD ("Aimee Crawford") was a resident of Pierce County, Washington and is married to Plaintiff, Ely Crawford.

3.    At all times relevant to the factual allegations herein, Defendant RADIUS RECYCLING, INC. *fdba* SCHNITZER STEEL INDUSTRIES, INC. ("Defendant Radius/Schnitzer") was a foreign Oregon Corporation whose principal place of business is located at 299 SW Clay St, Suite 400, Portland, Oregon 97201, in MULTNOMAH COUNTY, OREGON.

4.    At all times relevant to the factual allegations herein, Defendant TAYLOR MUNSON ("Taylor") was employed by Defendant Radius/Schnitzer as a Fleet Safety and Compliance Supervisor, Operations Supervisor, was one of Plaintiff's supervisors, and was a resident of PIERCE COUNTY, WASHINGTON.

5.    At all times relevant to the factual allegations herein, Defendant KEVIN MCINTOSH ("Kevin") was employed by Defendant Radius/Schnitzer as a Lead Driver, was one of Plaintiff's supervisors, and was a resident of PIERCE COUNTY, WASHINGTON.

COMPLAINT FOR DAMAGES - Page 2

6.      At all times relevant to the factual allegations herein, Defendant LACEY WESSON ("Lacey") was employed by Defendant Radius/Schnitzer as their Tacoma Dispatcher, was one of Plaintiff's supervisors, and was a resident of PIERCE COUNTY, WASHINGTON.

7.      All allegations against Defendants Taylor Munson, Kevin McIntosh, and Lacey Wesson, are imputed to Defendant Radius/Schnitzer as agents of the employer who supervised and discriminated against Plaintiff.

## II.      JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 based on Plaintiff's allegations that Defendants violated a federal statute, the Americans with Disabilities Act of 1990 [ADA], 42 U.S.C. § 12112, *et seq* for hostile work environment, failure to accommodate, disparate treatment, retaliation, and constructive discharge. Plaintiff and his counsel received the EEOC's notice of right to sue letter on November 12, 2024.

9.      This Court has supplemental subject matter jurisdiction pursuant to 28 U.S.C. §1367 over Plaintiff's Washington state law claims of Discrimination under RCW 49.60, Washington's Law Against Discrimination ("WLAD"), Negligent/Intentional Infliction of Emotional Distress the Tort of Outrage, and Loss of Consortium against all Defendants.

10.     Plaintiff Ely Crawford's claims arise from his employment with Defendant in Pierce County, Washington, making venue appropriate in the United States District Court in the Western District of Washington, Tacoma Division under 28 USC §§1391.

11.     This action has been filed within the applicable statutory time period.

## III.      FACTUAL ALLEGATIONS

COMPLAINT FOR DAMAGES - Page 3

12.     Plaintiff restates, realleges and incorporates by reference all previous paragraphs above as if fully set forth herein.

13.     Plaintiff is a decorated combat war veteran who served his country with two tours in Iraq in the U.S. Army from 2002-2006 and received numerous commendations, medals, and distinctions for his service. His service during his second tour included being a driver of large military vehicles for a high-level military official and his company would regularly get stopped at military checkpoints where they could be ambushed and killed. After Plaintiff had successfully completed his active service, he was released from duty, and was honorably discharged.

14.     Plaintiff received the following commendations and medals for his military service: USA/USAF Presidential Unit Citation, Army Commendation Medal, Army Good Conduct Medal, National Defense Service Medal, Global War on Terrorism Expeditionary Medal, Global War on Terrorism Service Medal, Army Service Ribbon, and the Iraq Campaign Medal. He attained the rank of SPC Specialist Calvary Scout 19D10.

15.     After returning home from war, Plaintiff met his wife, Plaintiff Aimee Crawford, they were married in 2008, and had three children, who are now 9, 10, and 12 years old. For the next ten years, Plaintiff and his wife were a happily married couple raising their family.

16.     Plaintiff trained and worked as a CDL truck driver and accrued over 9 years of commercial driving and heavy equipment operation experience. He attended an accredited commercial driving school that included 160 hours of endorsements and certifications for CDL Class A Doubles/Triples, Tanker, 48 hours of endorsements and certifications for CDL Class

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

1   B with Passenger and School Buses, 20 hours of certifications for CDL Class A Dump Truck,

2   forklift, community first-aid/CPR, commercial driver medical, and a Transportation Worker

3   Identification Credential ("TWIC") card. Plaintiff safely and efficiently operated Class A and

4   Class B commercial trucks including dry van, dump truck and pup, side-dump, curfew and

5   oversize loads with permitting and pilot cars, roll-off, lowboy, flatbed, tilt-deck, double trailers,

6   intermodal, and roll-back. In that time, he accrued significant knowledge, skill, and experience

7   in operating heavy machinery, including excavators, bucket loaders, scissor and boom lifts,

8   skid-steer, backhoe, dozer, bucket loader, roller, grader, sweeper, and forklifts, including

9   earthmover class machines and super-duty forklifts. Plaintiff operated these trucks and

10  machines in Washington state in metro, residential urban, rural, and alpine locations,

11  construction sites, quarries, contractor yards, freight and international shipping terminals, rail

12  yards, freeways, and tunnel projects.

13         17.    Defendant is a large multi-national $2.5 billion dollar for-profit company that

14  contracts with thousands of business clients in North America to pick up, transport, and dispose

15  of various large materials, metal, and waste.

16         18.    Defendant's truck driver employees in Washington state are tasked with picking

17  up materials from these businesses and transporting them for disposal at Defendant's processing

18  facilities.

19         19.    Defendant advertises itself as a veteran friendly company and claims to actively

20  promote veteran inclusion in their workforce.

21         20.    Defendant hired Plaintiff as a truck driver on or about November 2022.

22         21.    One of the numerous companies Defendant contracted with in western

23

COMPLAINT FOR DAMAGES - Page 5

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

Washington was the military base Joint Base Lewis-McChord ("JBLM").

22.    Plaintiff successfully went through training and had no "behavior problems."

23.    Plaintiff found out he was being dispatched to JBLM in the middle of January 2023.

24.    On January 30, 2023, Defendant started dispatching Plaintiff to JBLM to pick up recyclable materials from the military base.

25.    JBLM encompasses is the largest military base on the western coast of the United States encompassing 400,000 acres. It is so large that it spans both sides of I-5 from American Lake in Lakewood to the Nisqually reservation up to Steilacoom and down to Spanaway, Roy, and Yelm. On any given day, there are more than one hundred thousand (100,000) activity duty soldiers and employees living, working, and training on the base.

26.    JBLM has multiple entrance gates, providing access to different parts of the base for people who can present valid credentials. In 2023, contractors were able to gain access to the base using multiple JBLM gates if they had a contractor ID badge issued by JBLM.

27.    If a truck driver presented an ID badge that wasn't valid at one of these gates, soldiers would tell the driver to turn around and direct them to the Commercial Truck Inspection gate. In 2023, there was only one gate for commercial truck inspections.

28.    If a truck driver did not have a valid contractor ID badge for JBLM, they would be subjected to a lengthy and intrusive military inspection process.

29.    Being at the truck inspection gate and driving on the base reminded Plaintiff of checkpoints, battlefields, and military bases he experienced as a combat war veteran in Iraq

COMPLAINT FOR DAMAGES - Page 6

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

1    where soldiers would get attacked and blown up. It was a portal back to the war he thought he

2    had left behind years ago.

3         30.    Every time Plaintiff was dispatched to JBLM, he was forced to be stranded at

4    the base for long periods of time where he was surrounded by the accoutrements of war, terrified

5    and feeling like he was back in a war zone.

6         31.    Being at the base was similar to miliary checkpoints and installations Plaintiff

7    had experienced in war, involving barbed wire on fences, soldiers in body armor holding rifles,

8    snipers, soldiers holding mirrors on poles to look under your truck for bombs, military dogs

9    sniffing for bombs, opening and inspecting the engine compartment, being directed to leave

10   your vehicle, answering questions about who you are, where you are coming from and where

11   you are going, military vehicles driving around, marching soldiers training in formation, and

12   sometimes helicopters and aircraft flying overhead.

13        32.    Once Plaintiff made it through the military truck inspection gate, he then had to

14   drive across dozens of miles inside the military base, further exposing him to and reminding

15   him of combat. He had been a civilian for sixteen years, but driving onto the base brought his

16   military experience back home. Being exposed to the JBLM military base reminded Plaintiff

17   of his own military combat and caused him to experience increasingly severe disability and

18   PTSD symptoms.

19        33.    Without the JBLM contractor ID badge, it took Plaintiff anywhere from forty

20   minutes up to a few hours to get through the JBLM gate checkpoint and drive through the base

21   before he could leave.

22

23

COMPLAINT FOR DAMAGES - Page 7

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

34.     Plaintiff found out the hard way there were parts *inside* the base that he was not allowed to enter without a contractor badge, like the JBLM area of "North Fort," where there was another checkpoint where soldiers would inspect his pass again and Plaintiff would often be forced to turn around empty handed without completing the dispatch, driving back through the base, still surrounded by military vehicles, dogs, soldiers, and guns. Plaintiff told Defendants when this happened.

35.     JBLM employees at the gates told Plaintiff many times his pass was not valid and redirected him to the truck inspection gate, which was sometimes miles away – and every time that happened, Plaintiff told his supervisors and coworkers verbally in person, by phone or by text messages.

36.     Going through the gate quickly did not happen often and when it did happen, Plaintiff described it as "winning the lottery." He never knew when that process would take a short time or long time and that was like torture for him. After getting through the gate, he still had to drive long distances and spend more time on the base being directed by soldiers, which was very stressful for him.

37.     The hours he spent on the base were torture for Plaintiff and the visual and auditory stimuli from the base caused Plaintiff severe PTSD symptoms.

38.     Prior to Plaintiff's employment with Radius/Schnitzer, Plaintiff had never seen a physician for any PTSD symptoms and had never been diagnosed with PTSD.

39.     Plaintiff told his supervisors Taylor Munson, Kevin McIntosh and Lacey Wesson as well as the other two drivers on his team about the stress and anxiety he felt when

COMPLAINT FOR DAMAGES - Page 8

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

he was detained at a military base because it reminded him of being in similar checkpoints in war where his fellow soldiers had been killed.

40.     Plaintiff told his supervisors and the other drivers on his team numerous times that he is affected differently by having to go to JBLM than employees who are not military veterans because of his experiences in war and that being at JBLM was causing him stress and anxiety.

41.     Plaintiff indicated and asked Defendants many times verbally in person and over the phone to not dispatch him to JBLM before he ever put it in writing in a text message or email.

42.     Many times when he told his supervisors about his symptoms from being on the base or indicated he did not want to go to JBLM, they told him, if you have a problem, we will have to get the union and HR involved.

43.     Kevin McIntosh told him on more than one occasion, "if you ask not to go to JBLM, what's to stop all of us from asking not to go?" and "you have to stop with this not wanting to go to JBLM thing."

44.     Plaintiff's supervisors also claimed that it would be too inconvenient for the company to not send him to JBLM, which is not true because there was another driver who had a valid contractor ID badge and even offered to go to JBLM so Plaintiff wouldn't have to.

45.     Another driver on Plaintiff's team, Wayne Qualls, had a contractor ID badge for JBLM from a previous employer that allowed him to get through any gate at JBLM. Wayne and everyone else knew about the difficulties Plaintiff was having going on the base because Plaintiff told everyone he was a combat veteran and the base stressed him out, so he offered to

COMPLAINT FOR DAMAGES - Page 9

Taylor Munson and Kevin McIntosh be the one to go to JBLM every time instead of Plaintiff. He told them he knew the JBLM base layout really well from his previous employment and it was easy for him. Taylor Munson and Kevin McIntosh asked Wayne Qualls for tips about how to get contractor badges from JBLM and asked for his "contact" there, which was "Ronnie."

46.      Having Wayne Qualls be the driver dispatched to the military base would have reduced the amount of time it took the company to complete JBLM pick-ups and increased efficiency.

47.      Instead, Defendant sent Plaintiff to JBLM more than 30 times.

48.      Despite the stress and anxiety he felt, Plaintiff remained committed to doing an excellent job and Radius/Schnitzer gave Plaintiff quarterly bonuses for his performance and productivity. Plaintiff brought in donuts to a morning meetings to try to help the team morale. He tried to remain positive and continue doing his job. But the continued harassment about his disability symptoms and veteran status coupled with his repeated expose to JBLM caused his health to decline and his PTSD symptoms got progressively worse. Defendants' hostile work environment eventually caused Defendant Radius/Schnitzer to constructively discharge Plaintiff.

49.      On January 30, 2023, the first time Plaintiff was dispatched to JBLM, Plaintiff texted dispatcher Melissa Everett about his experience on the base that day. He told her when he found out JBLM was a customer, his "heart sank" and told her "the base stresses me out, and not for the ordinary reasons people stress out, like they can't find the bin. My Army service was a whole other life. My time in the sandbox was a whole other life beyond that. I've been

COMPLAINT FOR DAMAGES - Page 10

1    trying to put some of that behind me every single day for the last 17 years. I don't know what
2    else to say about it."

3        50.    After he told Melissa about his stress and anxiety, he also had a conversation
4    with Kevin McIntosh about his stress and anxiety and being on the base was really difficult for
5    him because he was a combat veteran.

6        51.    On January 31, 2023, Plaintiff texted Taylor Munson that the truck inspectors
7    were laughing at him because everybody else was going through the gate after making a five
8    second stop.

9        52.    Plaintiff texted information about the JBLM contractor ID badge to try and make
10   the gate process faster. Plaintiff told them the drivers can *exit* JBLM through any gate (because
11   he could not *enter* through any gate) and provided the website that detailed the procedure how
12   a company is supposed to obtain a contractor ID badge for their employees with an "Installation
13   Contractor/ Vendor Pass Request Form." He texted information from the JBLM website about
14   what kinds of badges were valid. He also mentioned the mental challenges he faced with being
15   detained at a military base because of his experience as a combat war veteran.

16       53.    On February 7, 2023, Plaintiff texted Taylor that the logistics gate is slow right
17   now and contractor badges still bypassing in seconds. Taylor responded, "Copy that."

18       54.    On February 7, 2023, a hydraulic line failed at JBLM recycling center, causing
19   a delay and Plaintiff was stranded on the base for repairs for one hour, which exacerbated his
20   stress and anxiety. Plaintiff texted his supervisors about it.

21

22

23

COMPLAINT FOR DAMAGES - Page 11

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

55.    On February 22, 2023 Plaintiff texted his supervisors that the "JBLM Logistics Gate is lame today. I'm beating a dead horse about those contractor badges, I know but (angry emoji)." Tacoma Dispatch responded "I have it on my list for sure:"

56.    February 22, 2023, Chad Felix texted Plaintiff that he didn't go to JBLM last time because he didn't have an enhanced drivers license.

57.    On March 13, 2023, Plaintiff texted "JBLM sucked and now Beau starting to look like a stretch."

58.    On March 17, 2023 at 9:41 am, Plaintiff texted Tacoma Dispatch "JBLM is bad today" and that he was delayed at the Logistics Gate for one hour and twenty minutes.

59.    On Monday March 20, 2023, Plaintiff told his supervisors that "JBLM is backed up all the way out the gate again" and was in line at the JBLM gate for two and a half hours.

60.    When Plaintiff finally got to the recycling center at JBLM, he discovered it was closed on Mondays and could not complete his dispatch. Kevin McIntosh and dispatch were responsible for checking to make sure that kind of thing didn't happen to drivers, but they were never reprimanded.

61.    As explained herein, having to remain in line in front of the military base gate was extremely stressful for Plaintiff because he was a combat veteran – being near and on the base affected him differently than employees who were not combat veterans.

62.    Because of his repeated and lengthy exposure to the military base, Plaintiff started experiencing severe PTSD symptoms in anticipation of going on the base, when he was on the base, and even after he left the base.

COMPLAINT FOR DAMAGES - Page 12

63.    It was during this time that Plaintiff started telling his supervisors verbally in person and over the phone he did not want to go to the military base because he was a combat veteran.

64.    After Plaintiff told Kevin McIntosh that he was a combat veteran, Kevin McIntosh asked Plaintiff if he had ever killed anyone when he was a soldier in war.

65.    On March 21, 2023, Taylor Munson sent a text to the group announcing recurring ride-along driver evaluations delegated to Kevin McIntosh, who was exempted.

66.    On March 22, 2023, Kevin McIntosh did a ride along evaluation with Plaintiff for training and his written comments include "'COMBAT MODE' NEEDS TO NOT BE SO AGGRESSIVE IN YARD." and "NO COMBAT MODE MENTALITY."

67.    Kevin McIntosh made additional written comments on a ride along evaluation, which included an additional page of "issues" that were factually incorrect.

68.    The next day Plaintiff asked Kevin about the ride along notes because the criticism didn't make any sense to Plaintiff.

69.    Plaintiff asked "What is combat mode? I've been to combat and I don't know what you're talking about." Kevin said "I just wanted to put it in a way you would understand or makes sense to you."

70.    The evaluation written notes stated "Not in a hurry – especially in yard. Stop looking for short cuts – obey directions in yard – IE going clockwise around to dump." Asking that Plaintiff "not [be] in a hurry – especially in yard, stop looking for short cuts" was contradictory because Kevin McIntosh had previously instructed Plaintiff to hurry up and make up for lost time and "put the boogie in his butt to play catchup" in February 2023.

COMPLAINT FOR DAMAGES - Page 13

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

71.    A comment about not revving the engine didn't make any sense because Plaintiff didn't over rev the engine, it wasn't possible because it was a really nice truck with a "rev limiter" that made revving the engine impossible. It had a governor and an auto disconnect. There was another truck with PTO problems, but it wasn't his truck.

72.    Another comment said to pay attention to restricted weight roads - "big ticket." However, there was no ticket, it's just that Kevin was riding along with him and noticed that it was a weight restricted road. Kevin knew that commercial trucks drive down that road all the time and that the City of Fife doesn't give out tickets there.

73.    "Don't get distracted" also didn't make any sense because Kevin was the one who was distracting Plaintiff by talking to him and repeating the same things over and over again while Plaintiff was driving. At one point, Plaintiff had to say, "I heard you, I understand it, I will take your advice, but we can't keep going over this, I need to focus on driving."

74.    Plaintiff asked why Kevin had written so many comments and Kevin told Plaintiff, I'm just trying to be helpful. This isn't going anywhere anyway. No one is ever going to see this. However, Plaintiff was still under the impression that this ride along was still going in his file.

75.    At the time he received the March driver ride along, Plaintiff knew the comments were false, but he continued to try and be a productive member of the team so he could keep his job and continue supporting his family.

76.    On March 23, Plaintiff texted Taylor Munson telling him he had concerns he wanted to articulate before that document became part of his professional record with the company. Taylor Munson responded "Good morning! I completely understand. I will make

COMPLAINT FOR DAMAGES - Page 14

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

some time for all 3 of us to sit down and discuss before I submit to our fleet safety team. Taylor ☺" However, Taylor never scheduled a meeting to discuss Plaintiff's concerns.

77.    On March 24, 2023, Radius/Schnitzer gave Plaintiff a productivity bonus of $864.81 in his paycheck for the previous quarter.

78.    On March 27, 2023 at 12:34 pm, a JBLM run appeared on Plaintiff's CRO, but because it was so late in the day and he couldn't complete it, Plaintiff declined it at 12:37 pm. Plaintiff's hours were typically 5:00 am – 1:30 pm, after which he would get home in time to meet two of his elementary school kids at their bus stop.

79.    On April 17, 2023 at 8:16 pm, Chad Felix brought up the JBLM contractor badges as an issue and Taylor Munson texted back "Working on this. I have the form just looking for a sponsor on base." Chad Felix responded "It's a step in the right direct, Sweet!"

80.    On April 19, 2023, there was a group text from Taylor Munson announcing Plaintiff had another ride along with Kevin McIntosh the next day.

81.    On April 25, 2023 Plaintiff texted dispatch "JBLM Logistics Gate is backed up bad." Lacey Wesson ("Tacoma Dispatch") said "Taylor said hang tight even though it sucks. We really need to get it done today." What isn't clear is why Radius/Schnitzer didn't have Wayne Qualls driving to JBLM when he wouldn't have had to wait in line.

82.    On May 4, 2023, Chad Felix forgot to end the call with Plaintiff and he overhead a conversation between Chad Felix and Kevin McIntosh where Chad Felix said "this dipshit . . . . . . dumb mutherfucker thinks he's special . . . every day it's something new with this guy."

83.    On May 22, 2023 a Freight Automated efficiency evaluation document provided for the Tacoma Drivers team showed Plaintiff's exceptional productivity.

COMPLAINT FOR DAMAGES - Page 15

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

84.    On May 31, 2023 Defendant Taylor Munson informed Plaintiff there had been a second driver ride-along evaluation that had been conducted that was put into his personnel file.  WHAT DOES IT SAY

85.    On June 16, 2023, Plaintiff received a productivity bonus of $922.65 on pay date 6/16/23 for that previous quarter.

86.    Prior to June 2023, Plaintiff had no negative write ups, no reports to HR, his evaluations, while tinged with veteran animus, were largely positive. He was always able to perform all the essential functions of the job.

87.    In the weeks before the July 4, 2023 JBLM airshow/Freedom Fest, the military engaged in training exercises to prepare for July 4th demonstrations at the base that further exacerbated Plaintiff's stress and anxiety.

88.    At the end of June, Plaintiff's wife, Aimee Crawford, tried to convince Plaintiff to go to the July 4th airshow and other activities with their family because the kids would enjoy it. However, Plaintiff told her he did not want to go onto the base and did not want his family to go either. He said he hated being on the base, he had asked Defendant to not send him to JBLM, and never wanted to go back there again. Plaintiff and his family did not go to the July 4, 2023 airshow.

89.    The symptoms Plaintiff started experiencing that got worse with more exposure to the base included tremors, shaking, increased heart rate, tightness in his chest, restricted blood flow to his extremities, tremors, shakes, difficulty communicating, heightened senses, interrupted sleep, inability to stay asleep, loss of appetite, retreating from social interactions, reclusively, and waking up in fear of going to the base.

COMPLAINT FOR DAMAGES - Page 16

90.     On June 26, 2023, Taylor Munson asked Plaintiff "Do you want me to use PTO hours for your sick day on last Friday?" Plaintiff's paystubs show he took 4 hours of PTO.

91.     On June 27, 2023, Lacey Wesson texted Plaintiff that she was "working on the JBLM pass project" and in response to her request for his personal information for a pass, Plaintiff responded "I respectfully decline." She texted back, "are you being serious?" Plaintiff explained "While in the Army, I did a lot of dark and difficult stuff for my country. I'm glad I did all that, but it's kind of a double-edged sword. . . JBLM is a dark and difficult place for me to go." Lacey Wesson was one of Plaintiff's supervisors and did not properly respond to what she knew or should have known was Plaintiff's request for an accommodation.

92.     This was not the first time Plaintiff asked to not be sent to JBLM, but after this date, Defendants started micromanaging Plaintiff and equated his request with "behavior problems."

93.     Three days later on June 30, 2023, Defendants set a brand new expectation with Plaintiff that he needed to check in with Lacey Wesson before leaving every day.

94.     On June 27, 2023, Lacey Wesson in Dispatch texted the group, "*Please refrain from bypassing me and going straight to Taylor if it's something that will affect your day or dispatches in any way, such as equipment failure, illness, delays, early departure, etc. Of course you're free to copy him or add us both, but please don't leave me out of the loop as I may not receive pertinent information."

95.     Taylor texted the group, "Great job Lacey! We really appreciate all of your hard work and we will do everything possible to support you. Taylor"

96.     This text exchange felt unsettling to Plaintiff because he had asked to not be sent

COMPLAINT FOR DAMAGES - Page 17

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

1   to JBLM, but his supervisors were not helping him.

2   97.    On June 28, 2023 at 9:05 pm, Plaintiff was told he was going to cross train with

3   Kevin in the lugger the next day.

4   98.    On June 28, 2023 at 9:19 pm Plaintiff texted Taylor Munson and Lacey Wesson

5   to let them know he was calling out of work on for the following day.

6   99.    On June 28, 2023 at 9:32 pm, Plaintiff also notified Kevin McIntosh separately

7   that he would not be in the next day.

8   100.    On June 29, 2023 at 7:05 a.m., Defendant Taylor Munson responded to the

9   group chat and stated "Your absence will be marked as not excused if you are not able to make

10   it in tomorrow or Friday. Taylor"

11   101.    On June 29, 2023 at 7:37 am, Plaintiff texted the group chat "Sorry sir, I'm just

12   not feeling well. I really hope to be back tomorrow. What does "not excused" absence mean?

13   Am I out of sick time?

14   102.    On June 29, 2023 at 7:55 am, Taylor Munson responded "Hi Ely, Thank you for

15   the update. If you are unable to make it in again tomorrow due to illness please make sure to

16   provide a doctors note before returning back to work. I will give HR a heads up that you are

17   reporting missed work due to illness today. The company does not provide sick time/pay. PTO

18   time is accrued."

19   103.    Plaintiff texted Taylor Munson back on June 29, 2023 at 8:36 am and 8:39 am:

20   "okay, and sorry I'm not more savvy on how PTO works, or what "unexcused" means. I'll dig

21   up the policy and read it. Something I should have done sooner. Lugger training – got it. I've

22   done lugger training with Kevin and Chad on two occasions thus far.

23

COMPLAINT FOR DAMAGES - Page 18

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

104.    Taylor texted back at 8:48 am: Thank you. Yes, Lugger training. I just spoke with Kevin and he said you have not trained with him and only trained with Chad one time on Lugger. We will have you do 2-3 more training days to make sure you are good to go and then do any follow up training as needed. Taylor."

105.    Plaintiff texted Taylor Munson a few minutes later on June 29, 2023 at 8:56 am "On another note, I still have those concerns and reservations about training with Kevin. It's hard for me to overlook that ride-along incident and the interactions we've had since. I know he's your foreman and categorically the best and most experience guy for the job. There is broken trust and that's a difficulty. Chad has been less adversarial, but has also displayed some challenges with antagonism and compartmentalization. I understand that if there's friction, I'm the new guy and obviously the common factor. Whatever, I still think all this stuff can iron out – it's just people stuff and shoring up a new team. The one thing that might not, and sticks in my craw the most, is that which is relative to my Veteran status. There have been some real red flags about that. I have seen this kind of thing before and have started to withhold that detail about myself more and more, just to save the ordeal of having to prove I'm still just another human being."

106.    On June 29, 2023 at 9:06 am, Taylor texted back: "Thank you for your feedback. Much appreciated. Kevin is our lead driver and lead trainer. He is committed to professionally providing any training that is needed for all team members. I will set up a meeting with you, me and Kevin to go over the training that was provided and discuss if any additional training is needed for you to be successful at Lugger. Have a wonderful day and please get rest since you are not feeling well."

COMPLAINT FOR DAMAGES - Page 19

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

107.    Defendant Taylor Munson said he would set up a meeting to discuss training, but did not address Plaintiff's complaints about the way he was being treated as a veteran by Kevin and Chad. Taylor also did not forward Plaintiff's concerns about how Kevin McIntosh and Chad Felix were treating him as a veteran to Schnitzer Human Resources.

108.    Plaintiff had told Taylor Munson on several occasions that driver Chad Felix was antagonistic towards him, which was concerning because he had to train with Chad. Chad frequently behaved the way that Plaintiff was accused of behaving, yelling, arguing, complaining, and swearing. However, Defendants did not discipline Chad for his behavior and did not help Plaintiff.

109.    Instead of addressing Plaintiff's concerns about how he was being treated as a veteran by Kevin and Chad, Taylor Munson contacted Defendant's Human Resources/ Labor & Employee Relations department and told them Plaintiff had "called out of work."

110.    On June 29, 2023 at 3:53 pm, Lacey Wesson texted "Hi Ely, I hope you are feeling better. Please note we have you scheduled for Lugger truck cross-training with Kevin tomorrow."

111.    On July 2, 2023, Kevin McIntosh texted Plaintiff "Cool working with you today. I could tell you weren't feeling to great. I appreciate your patience."

112.    On July 2, 2023, Plaintiff responded at 12:05 pm "I woulda stayed out sick, but Taylor threatened "unexcused" absence, whatever that means. Wife and kids sick too, with one in & out of urgent care on Friday -- thus, all the update messages I was getting... not distracting at all."

113.    Radius/Schnitzer violated Washington's paid sick leave law RCW 49.46 and

COMPLAINT FOR DAMAGES - Page 20

failed to provide Plaintiff with the statutory minimum of one hour of sick leave for every forty hours he had worked. A review of the Company Handbook and Plaintiff's pay stubs makes clear that Radius/Schnitzer did not follow the law's reporting requirements where all employers since 2018 must provide a balance of sick leave available that is separate from any accrued PTO.

114.    As a result, Radius/Schnitzer did not allow Plaintiff to take his available Washington paid sick leave and Plaintiff was forced to come into work because of Defendant's failure to follow Washington law.

115.    The Union representative Nick Lansdale had told Plaintiff and other employees it was okay to ignore company warnings that did not explicitly coincide with policy, and said the union would go to bat for Plaintiff and the other employees over any sick time or attendance write ups – i.e. company management is wrong, but there's nothing to do until somebody gets written up.

116.    On July 2, 2023, Taylor Munson praised Kevin McIntosh for his idea of holding a meeting with all of the Tacoma drivers [Plaintiff, Chad, and WQ] for 5-10 minutes each morning before everyone started their work for the day.

117.    On July 5, 2023, Plaintiff texted "A little long today." Lacey Wesson texted back "I know. We have two drivers out so we have to push it a little. I appreciate your hard work!"

118.    On July 6, 2023, Plaintiff texted "FYI – wife might be headed back to the ER today. I'm hoping we have everything covered. Looks like we've got her mom covering things with the kids today, but extended family resources across 5 households have been strained across 3 emerging fronts of gnarly.

COMPLAINT FOR DAMAGES - Page 21

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

119.    On July 17, 2023, Plaintiff texted Dispatch there were problems entering through the JBLM gate at North Fort: "The logistics gate is now sending me around to "Integrity Gate" because the air show breakdown is underway. . . I was told that we can only enter the base through the Logistics Gate. Vehicles must exit the base to cross the freeway and then re-enter the North Side through a standard gate. Those gates do not accept the Logistics Gate pass." It is not clear why they did not have Wayne Qualls on all of the JBLM dispatches.

120.    On July 21, 2023, Lacey Wesson texted the team, "Good afternoon, please note: * ALL * JBLM bins that come into the yard must be taken to the Pro scale. Do not take any JBLM bins to the normal scale unless told otherwise by dispatch." Chad Felix texted "May want to change that in the notes."

121.    Kevin McIntosh asked, "What if you are instructed by a Pro supervisor to dump at tin pile in the yard?" Lacey Wesson responded, "Of course I will change the notes. I'm telling you all directly so there is no misunderstanding because the notes are frequently ignored."

122.    Taylor Munson stated, "If you are told by PRO to dump in the tin pile please immediately let dispatch know."

123.    Chad Felix stated "I was told to dump it in the tin pile today. I will let you know if it happens again" and "Somebody's got to be the bad Apple I guess today that was me. It won't happen again."

124.    Lacey Wesson responded "there are no bad apples and nobody is being accused. You did what you were told to do today.  This is just direction for the future. It's not meant to be taken personally." Chad Felix responded, "Thanks."

125.    This text message exchange shows that there were always conflicting

COMPLAINT FOR DAMAGES - Page 22

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

instructions about where the drivers were supposed to put the loads/bins and who they were supposed to listen to.

126.    On Sunday July 23, 2023, Plaintiff notified his supervisor he had a family emergency that required him to stay home. (His wife was teaching summer school and his in-laws were suddenly unavailable to watch his kids.) Plaintiff texted Taylor Munson and Kevin McIntosh on Sunday that he would have to miss work the following day Monday July 24, 2023. Plaintiff also missed work July 25, 2023 to care for his daughter.

127.    Taylor Munson reported to the Radius/Schnitzer Director of Labor Relations that Plaintiff missed work on July 24 and July 25, even though Plaintiff used 16 hours of available PTO for July 24, 2023 and July 25, 2023.

128.    On July 26, 2023, the day Plaintiff returned to work after staying at home for his family and (according to an email Taylor Munson later sent to Human Resources on August 7, 2023), Taylor Munson had a "Sit-down discussion/coaching with Ely on 7/26/23 at 11am to discuss performance concerns. We discussed Communication, Attendance, following instructions, being a team player and filling out paperwork correctly. Ely signed off on the discussion that he understood everything that was discussed. Please let me know if you would like this sign off or any other information."

129.    The day of a disciplinary meeting on July 26, 2023 where Taylor Munson reprimanded Plaintiff, Taylor gave Plaintiff a military challenge coin and a couple of pride bracelets. Traditionally, a challenge coin bears an organization's insignia and is presented by commanders to a member of the unit to recognize special achievement or to honor individuals who have demonstrated outstanding service, leadership or dedication for going above and

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

beyond. It seemed like Taylor Munson was mocking Plaintiff's military background by disciplining him and then giving him something ironically related to his military background.

130.    At the beginning of August 2023, Plaintiff had a long conversation with Kevin McIntosh and asked not to be dispatched to JBLM because his PTSD symptoms from being a combat veteran was causing him issues at JBLM and again asked not to be assigned there. Kevin McIntosh responded by disregarding and deriding Plaintiff's request and said something Plaintiff had heard before: "Any of us could ask to not be on JBLM, then what, nobody goes? What makes you so special?"

131.    On August 7, 2023, Lacey Wesson sent Plaintiff a text message telling him to go to JBLM to get his gate pass, even though he had already told her he didn't want to. Plaintiff went to JBLM August 8th and 9th.

132.    Later that day on August 7, 2023 at 1:31 pm, Plaintiff texted Taylor Munson and asked if getting a badge for JBLM was a condition of employment.

133.    On August 7 at 1:59 pm, Taylor Munson said "Hi Ely, Great question! We may have certain customers that require badging, passes etc. All drivers are required to participate especially if this makes the job the drivers are doing more efficient by having a pass or badge. Specifically with JBLM and not have a badge you may be delayed and waiting for an unreasonable amount of time for each run, this would not be very cost effective or efficient for our customer, radius or our driver. If we have a driver that is refusing scheduled/assigned work I would need to notify radius HR and the union representative. Please let me know if you have any other questions. Taylor ☺"

134.    Taylor's message was a veiled threat that implied if Plaintiff refused to go to

COMPLAINT FOR DAMAGES - Page 24

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

JBLM, he would be at risk of losing his job, so Plaintiff responded on August 7, 2023 at 2:57 pm "Thank you, that's kind of what I imagined. I'm not refusing anything. I'm just processing some war related stress and anxiety and hadn't stepped foot on a base the last 17 years for a reason. . . ." Plaintiff then said he would "handle it" because Taylor Munson made it seem that if Plaintiff refused to go to JBLM, Plaintiff would get written up or be at risk of losing his job.

135.    Instead of helping Plaintiff by contacting HR about Plaintiff's war related stress and anxiety about going to a military base and even though Plaintiff said he was not refusing anything and would "handle it," Taylor Munson wrote an email to Human Resources thirty minutes later on August 7, 2023 at 3:28 pm mischaracterizing his exchange with Plaintiff: "Ely continues to be a challenge with not wanting to following instructions and challenge directions given to him. If Ely does not want to complete a task assigned to him the perception is he will call out or come up with a reason why he cannot complete a task. I will continue to monitor. . . Our lead union driver and I had a sit-down discussion/coaching with Ely on 7/26/23 @ 11am to discuss performance concerns. We discussed Communication, Attendance, following instructions, being a team player and filling out paperwork correctly. . ." Taylor included cut off text messages that Ely sent.

136.    Twenty minutes after sending the email to HR, Taylor Munson texted Plaintiff a falsehood: "I completely understand and am here to help in any way that I can. Taylor."

137.    Instead of helping, Taylor equated Plaintiff's war related stress and anxiety with being a challenge and not wanting to follow instructions. At this point, John Beix in Human Resources should have asked more questions – he should have noticed the discrepancy between what the supervisor was telling him and what the employee had actually communicated.

COMPLAINT FOR DAMAGES - Page 25

However, no one helped Plaintiff. They were more interested in creating a record against him.

138.    Even though Taylor Munson had acknowledged that not having the proper ID would result in unreasonable delays and even though Plaintiff made it clear that he was experiencing war related stress and anxiety and hadn't stepped onto a base for 17 years for a reason, Taylor Munson then sent Plaintiff to JBLM the next two days on August 8th and August 9th and forced him to get an ID badge for JBLM.

139.    Because of this interaction, Plaintiff forced himself to muster up the courage to return to JBLM the next two days on August 8, 2023 and August 9, 2023 to apply for the ID badge because he had received the clear message that his job was in jeopardy.

140.    Taylor Munson twisted a combat veteran's simple question and concerns about going to a military base and presented it to HR as though Plaintiff was being an uncooperative employee – and never mentioned the real reason why Plaintiff did "not want to follow instructions" and why Plaintiff was "challenging" directions given to him.

141.    The only reason why Taylor Munson would think that Plaintiff was being so uncooperative after a simple question is because he knew Plaintiff had already asked to not go to JBLM. Because Taylor Munson knew Plaintiff did not want to go to JBLM. Because he and Kevin McIntosh had already shut down Plaintiff's previous requests again and again and again. Plaintiff was once again forced to tow the line and put his health in harm's way. Defendants failed to respond to his repeated requests not to go to JBLM. They failed to accommodate his reasonable requests.

142.    Kevin and Taylor continued micromanaging and torturing Plaintiff with false allegations and reports. As a result, Plaintiff's PTSD symptoms got much worse.

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

143.    At the end of every work day, Plaintiff would review his dispatches for the next day. If he saw JBLM on his schedule, it caused him to lose sleep and have panic attacks. As he approached the base in his truck, his heart would beat faster, his breathing increased and he became extremely alert. He became very anxious. This stress and anxiety continued even after he left the base.

144.    Kevin and Taylor really ramped up micromanaging and disciplining Plaintiff and started retroactively documenting past "issues." They used the knowledge about his PTSD to mischaracterize Plaintiff's demeanor to HR and even to Plaintiff himself in an email dated September 8, 2023:

*8/8/2023 - Issue with taking too long to complete two dispatches and not being able to get a JBLM gate pass per Lacy. Ely was trying to avoid completing all his dispatches for the day.*

*8/15/2023 - Started early for no reason and went around truck DOT scale on the way to the customers location. Did not break down truck and trailer in location asked to by lead driver, instead broke down at someone's personal residence. Not following directions or instructions.*

*8/18/2023 - Failure to properly follow instructions. Ely was asked to ride with Chad for extra training today by our Lead driver Kevin. Ely refused and demanded he be dropped off at Tacoma fife Trailer to pick up another truck. The truck Ely picked up from Tacoma fife trailer needed a tire repair and Ely was asked by our lead driver to go toles Schwab and get repaired due to it being a safety issue. Ely refused.*

*8/18/2023 - Our lead driver and I did a Verbal written warning with Ely on Failure to properly follow instructions. Throughout the conversation Ely did not want to take accountability for his actions and only wanted to blame others. At one point in the discussion, he asked for approval to wear a bodycam to prove he is not the problem.*

*8/23/2023 - Kevin lead driver reports Ely's behavior was odd and inappropriate. When speaking with Ely his responses were short and rude. Lack of professional attitude.*

*8/23/23 - Lacey the NW dispatcher reports Ely's behavior was short and negative. At one point he hung up on her when she was speaking with him over the phone. Lack of professional attitude.*

*8/24/2023 - Received a text on 8/23 @ 5:46pm that Ely was coming down with cold symptoms and he was going to try and push through it. Received a text from Ely on 8/24@ 3:31am stating he was not going to make it into work due to his kids not feeling well.*

*8/25/2023 - Our dispatcher texted Ely at 1:44pm asking if he would be present at work on Monday. This was after Ely missed the 1:00pm check in expectation that has been set for all drivers. Ely did not text back with an update until Sunday evening 8/27 /23 @ 7:00pm.*

*9/7/2023 - Spoke with Ely about coming into work earlier than his start time at 5:00am without prior approval. Ely had decided to come into work early all week without approval. Spoke with Ely about him*

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

*needing to leave by 1pm each day for childcare. I told Ely that this was never mentioned during the interview process, and he just mentioned that he would need to be off by 1pm each day on 9/7/2023. I said we may not be able to accommodate this new request from him.*

*9/8/2023 - Ely mentioned to our lead driver in a conversation this AM he needs mental health support and believes he has PTSD and is working with the VA.*

145.    While they were creating a record, Taylor, Kevin and Lacey were using psychological manipulation against Plaintiff by telling him that people were afraid of him.

146.    On August 18, 2023, Plaintiff was told to train with fellow driver, Chad. During the ride along, Ely asked to get out of the truck so he could wait at the gate for it to open to maximize productivity. Kevin later told Ely that Chad had called him and said "He's not gonna follow the instructions … he's freaking me out … I don't know what he's gonna do."

147.    Plaintiff asked what he meant and Kevin McIntosh said "considering you were in the service, being a war vet and all that." Kevin said it was concerning "considering his history" and "the way he carried himself and spoke with people." It was clear that the history Kevin was talking about was a reference to Plaintiff's military experience and implied that people were afraid of him because they thought his PTSD would make him violent.

148.    Instead of talking with Chad about this incident where he verbalized an unfounded and derogatory perception of Plaintiff as a violent combat veteran with PTSD, Taylor and Kevin decided to write Plaintiff up.

149.    The same day on August 18, 2023, Taylor Munson and Kevin McIntosh gave Plaintiff a verbal warning for an alleged incident that occurred on August 17, 2023.

150.    On August 22, 2023 at 6:04am, Plaintiff sent a text message to his supervisor Taylor Munson telling him again about his anxiety related to trips to the JBLM military base, that he was in contact with the VA, that he was in the process of being diagnosed, and highlighting how he was being treated. Plaintiff's text message stated: "In light of some recent

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

events inside and outside of work, I have initiated contact with the VA [Veterans Administration]." Of notable concern are stress and anxiety around trips to JBLM, which I mentioned a while back, as well as some social anxiety. Also, the admonishments during our warning sit down that I have been generating complaints from all sectors inside and outside the company was quite alarming. I am in the initial stages of the VA assessment, diagnosis, and investigation process. I will appraise [sic] you of any pertinent developments along the way. I appreciate your patience thus far and I would like to reiterate my commitment to support this team in every way I can."

151.    On August 22, 2023 at 6:26 am Taylor Munson texted Plaintiff in response to Plaintiff's text message, "Good morning Ely! Thank you for the update. We really appreciate your commitment to wanting positive change and to supporting the team. Taylor."

152.    Later the same day (that Plaintiff had announced he was applying for disability benefits from the VA)**,** Kevin and Taylor brought Plaintiff into an additional disciplinary meeting that lasted 1.5 hours until 3:20 pm, which caused him to miss picking up his kids from the bus stop. Kevin and Taylor told Plaintiff this is part of a disciplinary escalation and if it continues, it will result in termination. Plaintiff was told after two write ups, he would lose his eligibility to receive a quarterly productivity bonus, which would have cost him approximately $1,000 every three months. He had received productivity bonuses every quarter previously.

153.    Taylor claimed in the meeting "I'm trying to protect you. The company is the one that would fire you."  The allegations in the Employee Warning Notification claimed that on August 17, 2023, Plaintiff had become argumentative and was not following instructions given to him by the Tacoma scale team the week before on August 17, 2023.

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

154.    Plaintiff told Taylor Munson that "nothing written here is correct. If that's not what happened, what is my recourse? How can I appeal this?" Taylor and Kevin employed pressure tactics, and interrupted him when he was trying to talk. Taylor told Plaintiff "Larissa is a manager." Taylor said "this is an example of a pattern of behavior" Plaintiff is exhibiting and he is "hearing from a lot of people, customers, coworkers." "Your behavior needs to change completely. You need to be 100% on board, or this is going up the process up to and including termination." Plaintiff asked Taylor to look at the videos that were available at the scale house and in his truck, but Taylor brushed him off and refused to look at the video feeds or tell Plaintiff what if anything he had done wrong. Taylor told him we expect your behavior to be 100% cooperation. Plaintiff responded, there are cameras at the scale house and in my truck – why won't you look at them?

155.    The decision about if a load goes to the shred pile is ultimately up to the graders and they tell the drivers where to put it. They assess the load for destination and use visual inspection and customer account info to help… but the graders are ultimately responsible for directing the load. When in doubt, they often stop and open the trucks to see better what's inside and where it should go, on their authority, unless they call for a supervisor or management decision. Plaintiff remembers there being confusion over where to put the Boeing materials because they have so many types of accounts and material mixtures and sometimes the mixture policies are not followed at the factory sites, so often drivers had to make a judgement call. Most of Boeing was not "certified destruction" materials. There were often questions about where the load would drop, but Plaintiff would always drop where the scale or graders instruct – that was the protocol.

COMPLAINT FOR DAMAGES - Page 30

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

156.    Taylor Munson gave Plaintiff the impression that a lot of other people were giving him complaints. Taylor Munson told Plaintiff that "lots of customers" had complained, but couldn't give him examples of what they complained about. Kevin and Taylor told Plaintiff that people felt uncomfortable around him. Defendant Kevin McIntosh told Plaintiff "People are afraid to approach you because they are worried you'll fly off the handle." When Plaintiff asked what the complaints were about and asked Taylor to look at the video camera footage that was available, Taylor did not give Plaintiff any specific details and refused to look at or show Plaintiff any video footage. Taylor Munson and Kevin McIntosh knew that Plaintiff needed to leave by 2:00 pm to be at the bus stop for his elementary school kids, but kept him in a meeting late anyways.

157.    Ely was looking at the piece of paper they handed him and Taylor Munson and Kevin McIntosh were talking about their personal finances and how Kevin's girlfriend had lost her job. They were talking about how everyone's ass is on the line and that corporate is going to fire us all and how hard things are. It seemed like they were trying to intimidate him.

158.    Plaintiff had been told that after two write ups, he would lose his quarterly bonus, which was approximately $1,000 every three months, so he was understandably concerned about being written up.

159.    After the meeting, Plaintiff talked to Kevin McIntosh about the stress that was created over something that never had happened. Plaintiff said, "You and I know that." Kevin said "Yes, I believe you Ely that they lied about the scale thing, but it doesn't matter." Plaintiff asked Kevin McIntosh to tell him what he was doing wrong and to be specific on how he could change his behavior, but there were no suggestions on how he could improve.

COMPLAINT FOR DAMAGES - Page 31

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

160.    At the end of August 2023, Plaintiff and his family contracted an illness that was later diagnosed as COVID-19. On August 23, 2023, Plaintiff texted "Dangit … cold symptoms coming on fast & hard. I'm gonna try to push through it. If it knocks me down, I'll get word to Kevin before trucker shift start so he can organize moves on any backup plan."

161.    On August 24, 2023, Plaintiff texted "Sorry guys, I'm down. I hadn't got word from my wife about the kids for today by the end of shift, but an idea I had was maybe do that back-to-back trailer run with later start and end times. It seems most expeditious to run them that way, just shifted later, so long as Safari wouldn't close before the second run's arrival. Wife's home Friday, so that double trailer run could work, if you all think that's feasible and best."

162.    Lacey Wesson asked if Plaintiff would be there tomorrow and Plaintiff texted "Still knocked down as of right now. Seems like I could be past the worst of it, though. Hopefully functional by morning."

163.    Lacey Wesson texted "I really need a yes or no. It's very difficult to build a dispatch on "maybe" and I have to communicate with and be accountable to our customers. Your dispatches tomorrow were already pushed from today. I'm sorry you're not feeling well but starting the day off in emergency mode trying to move everything around and somehow get you covered again is problematic." Plaintiff texted back six minutes later saying "Okay, I understand. I've been out of commission and bedridden since 6pm yesterday and only maybe starting to improve, so best to call it "no."

164.    On August 25, 2023 at 8:04 am, Taylor Munson emailed Human Resources and stated he thought Plaintiff was lying about his reasons for missing work. The email stated, "Hi

COMPLAINT FOR DAMAGES - Page 32

John, I added time on our calendars today to speak about Ely's most recent behavior. As you know we had a formal warning discussion with Ely on Friday 8/18. We went over the write up and discussed Ely's behavior and the expectations moving forward. Ely's behavior on Monday 8/21 and Tuesday 8/22 appeared to be better. On Wednesday 8/23 Ely's troubling behavior had returned." "Ely's attitude was negative, and he was standoffish with our lead driver and dispatch." This behavior Munson observed was the day after a 1.5 hour-long reprimand meeting about an "incident" that Plaintiff had insisted did not happen.

165.    Plaintiff stopped wanting to talk on the phone with his supervisors because they continued to ignore his requests and mischaracterize his behavior, which is ironic because his supervisors used this inconsequential detail and wrote him up to HR for not answering the phone: "Ely would not answer Kevin's phone calls. Ely was being very short with dispatch and on one phone call dispatch reported that he hung up on her. Our lead driver reports that Ely's unprofessional behavior had returned." . . . "Ely has mentioned on more than one occasion that his behavior issues are caused by PTSD and he thinks he has a VA claim that can be filed for PTSD and past military trauma. This was mentioned to our lead driver after our formal discussion on 8/18 and Ely has also sent this over via text message on 8/22. On 8/23 Ely sent a group text to our lead driver, dispatch, and me that he was starting to feel ill and may not make it in on 8/24. We believe this was after he had reviewed the dispatch jobs he had for 8/24. On 8/24 early morning Ely sent over a text message calling out that he was not coming in due to something with his kids. We believe that he is being untruthful about his reasons to miss work. Our lead driver and dispatcher are to the point where they do not know what to do and how to communicate with Ely any longer. Each time anything is addressed with Ely he becomes

COMPLAINT FOR DAMAGES - Page 33

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

unhinged, and his behavior becomes unprofessional and is making the other drivers and dispatch very uncomfortable." Taylor provided Kevin and Lacey's cell phone numbers. "Talk to you soon. ☺"

166.    Plaintiff provided a doctor's note to Taylor Munson on August 28, 2023 that stated he needed to be out until September 3, 2023 because of having COVID, but Taylor Munson never reported that updated information to Human Resources.

167.    On Sunday August 27, 2023 at 7:17 pm, Tacoma Dispatch texted "Ely, I hope you are feeling better. Same as yesterday, I need to know if you will be here Monday. Please advise soonest. Thank you."

168.    Plaintiff responded at 7:38 pm "Yes. Badass cold this one, holy hell, but I'm gonna be in tomorrow. Keep yer distance, this one's from Europe. I see the wheels & radiators run tomorrow from Lakewood P&P to SchnWoody … familiar run… Curious about the meeting task and I'll rub elbows with Kevin in the morning if I don't hear more before then. Again, sorry for the late check-in, I'm pretty obliterated."

169.    On Monday August 28, 2023, Plaintiff was still feeling sick, but because he had been admonished for "calling out" and because he had been told "the company does not provide sick time/pay," Plaintiff was worried about being written up, so he went in anyways.

170.    At 5:07 am on August 28, 2023, Plaintiff texted "Figured it was just a strain of seasonal cold from kids in [our] neighborhood that went to Europe, but after being sick since Wednesday and some shortness of breath last night, I decided it was high time to take an over-the-counter covid test this morning, which came back positive. I'm gonna follow up with my doc. Kevin has sent me home. Again, I'm really sorry about the late notice on this, I was gonna

COMPLAINT FOR DAMAGES - Page 34

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

tough it out. Operation Global Clustercough continues …" Kevin texted at 5:08 am "Let's us know what's up as soon. As you know. Get feeling better."

171.    Plaintiff responded at 5:10 am on August 28, 2023, "I'm quarantined until 09/03/23 and rather miserable at the moment. Wow, this one suuucks … I rate this COVID experience zero stars."

172.    A few hours later on August 28, 2023 at 8:06 am, Munson texted Plaintiff "Good morning Ely, I hope you are feeling better. Please make sure to get a doctors note releasing you back to work. Also you have now used all of your available PTO/Sick time. We can talk more about this once you return. Taylor."

173.    The same day Taylor requested a doctor's note, Plaintiff provided an out of work note from his doctor stating Plaintiff needed to be out of work from August 23, 2023 until September 2, 2023 due to COVID and could return on September 3, 2023.

174.    On August 28, 2023, Taylor texted at 12:31 pm "Thank you. I hope you feel better soon."

175.    Munson did not inform HR that Plaintiff had been experiencing COVID symptoms and was ultimately diagnosed with COVID.

176.    Radius/Schnitzer failed to give Plaintiff any Washington paid sick leave in violation of Washington law and Plaintiff was now under the stress of not having what Washington legislators reasoned was the purpose of paid sick leave: "The demands of the workplace and of families need to be balanced to promote public health, family stability, and economic security. It is in the public interest to provide reasonable paid sick leave for employees to care for the health of themselves and their families."

COMPLAINT FOR DAMAGES - Page 35

177.    Because Plaintiff was out for seven consecutive days, Radius/Schnitzer also had a duty to inform Plaintiff about his rights to take Washington Paid Family Leave under the Employee notice of rights, Title 50A RCW 50A.20.010.  The qualifications to take that leave is 820 hours and a serious health condition. Plaintiff would have qualified to take that leave.

178.    However, Taylor Munson never informed Plaintiff that he could use Washington paid sick leave or that he was eligible to take Washington Paid Medical Leave. Instead, he told Plaintiff he was out of PTO. A review of Plaintiff's paystubs reveals that Plaintiff was indeed paying for Washington paid family medical leave benefits, but Defendants never informed him of his rights or allowed Plaintiff to use those benefits.

179.    On September 8, 2023, Taylor Munson and Kevin McIntosh brought Plaintiff into another long meeting where Kevin told him "people are afraid of approaching you, especially considering your history." They made it clear that their problem with Plaintiff was him being a veteran with disabilities. They told him that he wasn't going to get his quarterly productivity bonus because of his behavior.

180.    Plaintiff asked Kevin to tell him where he was going wrong and to be specific on how he could change his behavior to avoid this onslaught, but there were no suggestions on how to improve. Kevin told Plaintiff he needed to "be a better team player." On September 8, 2023, Plaintiff texted Kevin asking for help identifying "if there are truly personality or behavioral issues that you think are [disability] related, or something like that, please help gather written testimony and help me document that for the VA." However, Kevin never responded or provided Plaintiff with additional details.

181.    On September 8, 2023, Taylor Munson emailed HR representative John Beix:

COMPLAINT FOR DAMAGES - Page 36

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

*Ely again was shocked to hear his behavior issues were continuing and said he is having some social anxiety,* feeling exhausted from being ill [from COVID] and just talking about our behavior expectations set for him is stressing him out. Ely said he has never had behavior issues at any other job, and he is seeking out support from the VA for PTSD. I also provided Ely with information for our LYRA Employee Assistance Program in case he would like to speak with someone for added support. Ely also mentioned the way he is acting is his personality, but I chimed in and said you did not have behavior issues when we first hired you and did a 6-week driver training with our lead driver with no behavior issues reported. All this week it was reported to me by our lead driver [Kevin McIntosh] that Ely's behavior was - mad at the world attitude, ignoring team members, not being a team player, not communicating Etc.

182.    On September 10, 2023, Plaintiff filed an inquiry with the EEOC relating to the discrimination he was facing at work. The adverse actions were: "Beginning with verbal statements, assumptions, pointed questions, humiliation, condescension, veiled threats of reprisal, scolding, and remarks indicative of bias, discrimination, and harassment, shortly after my date of hire (11/01/2022), I have been repeatedly targeted by my lead driver and one peer driver with seniority, as well as my supervisor. I have been accused of being in combat mode. I have been told that people are afraid of what I might do? And hesitant to approach me because of the way I stand, carry myself, and communicate especially considered your history. I communicated concerns about possible discrimination to my supervisor to no avail. I was instead written up for something and harassed for 90 minutes straight about things that were not in the write up. The union representative present was my lead driver, chief lodger of complaints against me."

183.    On September 10, 2023 Plaintiff also reached out to Nick Lansdale Union Teamsters 313, Subject Line: ADA/Disabled Veteran, saying he doesn't feel comfortable talking with Kevin as his union representative and needed help.

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

184.     On September 11, 2023, Plaintiff spoke with everyone on the team about 9/11 and how his PTSD affected him when he goes to the military base. Kevin tried to call him afterwards. Defendants assigned Plaintiff to go to JBLM the next day.

185.     On September 12, 2023 Plaintiff was at the JBLM military base from 6:58am to 8:40am, where he was subjected to a military inspection again.

186.     On September 12, 2023 at 7:16am, Plaintiff texted Taylor and Kevin, "I have been declined access through a JBLM regular gate by the armed guard, SCPL Ballehr, and redirected to truck inspection. Upon inspecting the pass I was issued by Waller Hall with his Army Specialist partner, I was informed that this pass does not grant general gate access. Now I'm back to going through the whole thing again – canine handler, mirror scan, armed patrol, open the engine compartment, open the doors, open the toolbox, do all the paperwork... reminiscent of checkpoints in the Diyala Province of Iraq, circa 2005."

187.     Lacey Wesson texted "Wow, if it's not official, how have y'all been getting in this whole time? What a massive pain in the ass that place is. I'm sorry you're having to deal with that for such a simple thing. Please keep us updated." However, Plaintiff had already communicated numerous times about the difficulties he had accessing JBLM gates, so this was not new information.

188.     On September 12, 2023 at 8:42 pm, Plaintiff texted Taylor and Kevin "Good evening Taylor and Kevin, having to be at JBLM today caused my health to suffer again from panic attacks I get because of my military service. I would like to ask that I be de-selected or de-preferred for trips to JBLM. Especially because the gate pass failed again, I get stuck on base for hours and exposed to all the things that cause me anxiety. It's often a dark and difficult

COMPLAINT FOR DAMAGES - Page 38

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

experience for me. If it's possible for someone else to be making those runs, it would be very much appreciated."

189.    On September 13, 2023 at 8:20 am, Plaintiff texted "Hello sir, I texted you guys when it happened: and re-sent the text message he had sent on September 12, 2023 at 7:16am again. Plaintiff also gave them the phone number to call. "That's all I know. They said it was no good and I have to use truck inspection. Tell HR I said hi. ☺"

190.    On September 13, 2023 at 8:22 am, Taylor responded "We will reach out today and see what the issues is with the gate pass. I do not believe any other driver has had this issue so we should be able to get resolved. Taylor"

191.    On September 13, 2023, Plaintiff started texting the team at 6:21am on September 13, 2023, providing dozens of updates throughout the day. This is important because Lacey later claimed in a write up that Ely had not texted Lacey about any delays until 10:45 am, which is patently false. Kevin and Taylor later claimed in another write up and disciplinary meeting that Plaintiff did not provide Lacey Wesson with any updates on delays that day he had been late without any explanation, which was not true. The official write up and the individual write ups by Lacey Wesson and Kevin McIntosh were fabrications.

192.    At 6:21 am, Plaintiff texted the group chat, "Hi guys. Since a bunch of us are going to CBR, I though I would give my ETA …6:45am… please let me know if I should adjust my arrival time to de-conflict the confined space." Kevin texted back "Got mine, good call though. Thanks for the heads up."

COMPLAINT FOR DAMAGES - Page 39

193.    On September 13, 2023 at 7:50 am, Lacey Wesson texted the driving team, "Good morning, fellas – *since we are so light today*, I will offer dispatches as they come in so we can have a full day."

194.    On September 13, 2023 Plaintiff texted at 8:00 am "If I can get through a day without a broken bin, jeez!" Lacey Wesson in Dispatch responded, "I know the number of broken bins lately is annoying to say the least."

195.    Lacey Wesson in Tacoma Dispatch texted "2 swaps at Safari Auto." At 8:56 am, Kevin McIntosh texted back, "Tomorrow." Lacey responded, "Not tomorrow, I'm finding work for today**.** Unless y'all have plenty to do today. I'm making calls trying to take [care] of everybody. I confirmed with Taylor that we can do singles to Safari if we need work. Let me know who needs it."

196.    On September 13, 2023 at 9:40 am, Kevin McIntosh texted that he had been pulled over. "I would schedule it for tomorrow, but I have no idea what everyone has left to do. I just got pulled over near Shelton by DOT. Doing a level 2 paper work and safety audit." Lacey Wesson in Tacoma Dispatch texted "Fantastic."

197.    Public records show Kevin was pulled over on September 13, 2023 by Washington State Patrol for an audible air leak on September 13, 2023 and received violations for code section 393.75(a)(3). "Tire-flat and/or audible air leak: AXLE 4 RIGHT SIDE INSIDE TIRE MEASURED AT 40PSI TIRE PRESSURE MAX IS 120PSI MUST BE 50% OF MAX. MUST REPAIR/REPLACE BEFORE CONTINUING.

198.    This shows Kevin violated one of the essential functions of the job, to perform pre-trip and post-trip inspections of assigned vehicles to ensure that mechanical, safety, and

COMPLAINT FOR DAMAGES - Page 40

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

emergency equipment is in good working order."

199.    He asked the officer to drive a little ways to go fill up his tire, but wasn't allowed to and had to wait for another vehicle to come tow him to a service station. However, Kevin was not disciplined or written up to HR for that incident or blamed for the "delays" this caused.

200.    On September 13, 2023, Plaintiff continued texting with Lacey at 8:03 am, 8:04 am, 8:13 am, 8:15 am, and 8:53 am. Kevin was in the group chat and could see these messages.

201.    On September 13, 2023 at 10:15 am, Lacey Wesson in Dispatch texted "Ely, I added a dispatch to you to stage Pro bins for transfer to Woodinville tomorrow." Lacey failed to respond to any of Ely's text messages for an hour and forty five minutes at 11:58 am, but Plaintiff continued sending her updates while he was working, even though Lacey did not respond to his questions. This is an important fact because Lacey's individual 9/14 write up had claimed that Plaintiff was not texting her delays.

202.    Taylor, Kevin and Lacey later claimed in a disciplinary write up and meeting claiming in part of the write up that "Ely was delayed significantly with starting his run. On 9/14/2023, Ely was instructed by our NW dispatcher Lacey to provide her with a break down of any work delays Ely had on his route from the previous day 9/13/2023. Due to productivity concerns and being able to valuate why the work performed and the total hours worked on 9/13/2023 not matching up. Ely refused to provide our dispatcher Lacey with a detailed break down of work delays for 9/13/2023."

203.    Lacey claimed that Plaintiff was not sending Lacey updates and that caused delays, when in fact the record proves the opposite and that there were other reasons why there were delays for the driving team unrelated to Plaintiff. Lacey was the one not communicating

COMPLAINT FOR DAMAGES - Page 41

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

with Ely for a couple of hours. Lacey's text message at 7:50 am "Good morning, fellas – *since we are so light today*, I will offer dispatches as they come in so we can have a full day" shows that they were trying to use Ely as a scapegoat to deflect from their lack of organization or there wasn't enough work for that day, which would impact their "numbers." Kevin getting pulled over by the Washington State Patrol/DOT and having to wait for a service vehicle obviously caused delays for the team. Instead of taking responsibility for the problems they created, Defendants used Ely has a scapegoat and focused their animus on Plaintiff's "behavior problems" caused by his war time stress and anxiety.

204.    On September 13, 2023 at 10:42 am, Plaintiff texted Lacey Wesson in Dispatch back stating the "bin 15-56 is full at Peterson Aluminum, but it's the steel bin. It's supposed to be 15 yd because the last one was lie 40,000lbs in a 20yd. So how could I deliver the assigned 30yd bin to remove that?? 15-56 is definitely ready, though. And it's definitely steel. The aluminum bin doesn't look quite ready to go, but is that the one they want me to swap?" Lacey did not respond and Plaintiff continued to work.

205.    On September 13, 2023 at 11:20 am, Plaintiff texted "Wheew got that sorted out. Okay, departing Peterson Aluminum and looking probably real tight for the Woodinville transfer prep today. I don't have any issue doing the whole thing in the morning, so long as you guys and Jasmine are cool with it." Lacey did not respond and Plaintiff continued to work.

206.    At 11:57 am, Plaintiff texted "Okay, I imagined it was doing the whole trailer load up and backhaul to the yard. Kevin clarified that if all we can do is weights and paperwork, that's still a jump ahead and I'm straight on that now. I should have just enough time." A minute later at 11:58 am, Lacey Wesson in Dispatch finally texted back, "Perfect!"

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

207.    These text messages are important because Taylor, Kevin and Lacey later claimed in a disciplinary write up and meeting that Plaintiff had "failed to follow instructions to pre load his next days Tacoma PRO transfer dispatch run to save time instead of loading the next morning which would cause major delays and set backs. Ely did not preload his run on 9/13/2023, and decided to load his run the next morning on 9/14/2023. Ely did not follow the instructions given to him by our lead driver Kevin and Ely was delayed significantly with starting his run."

208.    In fact, the disciplinary write up does not comport with the record set forth in text messages that prove McIntosh had actually told Ely "if all we can do is weights and paperwork, that's still a jump ahead." And Plaintiff told them he was running late that morning, which he communicated to the team by phone and text. On September 13, 2023 at 11:35 am, Plaintiff also texted Taylor Munson "I asked Kings fleet to take a look at my treadle valve return spring tension … it's not a big deal just something they will try to fit into the schedule … and the truck should definitely stay in service … And I also put it on the Pre-trip." Taylor responded, "Thank you sir! I appreciate the heads up."

209.    On September 13, 2023 at 12:57 pm, Plaintiff continued texting "Delays with the PRO bins being over-height again." Lacey Wesson in Dispatch asked for photos, but Plaintiff was already working on solving the problem and texted back "We've got it fixed now, Jasmine had a different plan in mind for a crane to come and shift the load, but I was already here so I could kind of shake it a little bit, anyway we worked it out." At 1:09 pm, Lacey Wesson in Dispatch responded "Okay great."

210.    On September 13, 2023 at 1:36 pm, which was very late in their day, Lacey

COMPLAINT FOR DAMAGES - Page 43

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

Wesson in Dispatch texted "Don't forget to complete Peterson," meaning Plaintiff just needed to mark it done in the CRO system.

211. At 1:50 pm on September 13, 2023, Plaintiff checked in with Lacey and texted "Just finishing the day. Have a good evening. Talk to ya tomorrow ☺"

212. On September 14, 2023, at 4:08 am, Taylor texted Plaintiff that he had spoken with HR (the day before on September 13th) about his request for an accommodation to not be dispatched to JBLM, but that Plaintiff would have to produce medical documentation about his disability and why an accommodation was needed.

213. After Plaintiff went over their heads and communicated directly with HR about not being dispatched to JBLM, Kevin and Lacey wrote handwritten statements dated September 14th detailing what Ely had done wrong the day before on September 13th, which as proven by the text message was a complete fabrication. It was almost as though they were making Plaintiff pay for speaking up.

214. On September 14, 2023 at 4:55 am, Plaintiff texted "I'm about 15 minutes behind the curve today. Start without me. Just been a lot going on lately, and I'm really sorry."

215. On September 14, 2023 at 7:02 am, Kevin McIntosh texted Plaintiff "20-51 carbon bin ready to go at Iton form ☺" and Plaintiff responded at 7:03 am, "Alrighty then." At 7:04 am, Kevin McIntosh asked "What bins are you taking to Woodinville"

216. On September 14, 2023 at 7:07 am, Lacey Wesson in Tacoma Dispatch texted, "Ely why did you fail the morning meeting?" Ely texted "I was running a few minutes behind and missed the meeting. I did let the guys know and I called Kevin to touch bases.

217. On September 14, 2023 at 7:14 am, Lacey Wesson in Tacoma Dispatch texted

COMPLAINT FOR DAMAGES - Page 44

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

Plaintiff "Okay, that is not what failing is for. It has nothing to do with employee activities, it's for customers. Every time you fail something, it automatically gets emailed to about twenty people and <u>affects our numbers</u>. Nobody told you to do that. DO NOT fail anything without approval from me or Taylor." Plaintiff texted back in the same minute, "Oh crap!"

218.    On September 14, 2023 at 7:31 am, Plaintiff texted an update "Just gotta get it over this lip" showing a photo of a bin and a metal obstacle.

219.    This is important because Kevin's hand written statement allegedly dated on 9/14 states:

> On 9-13-23 I instructed Ely on the most efficient way to do a transfer run to Woodinville – he decided not to follow my instruction – the next day he was late to work – hadn't hooked to his trailer. Had not used his time efficiently. This has been an on going concern. Because of this it took him 3 plus hrs. to begin his run to Woodinville – I called Ely to inquire what was going on, or if he had run into a problem. "Just one of those days" was his response – during this conversation Ely referenced the fact that he will not go to JBLM. He will not jump through hoops. I informed him, that was up to him, but seemed a reasonable request. Follow instruction has been and continues to be a major problem."

220.    Plaintiff never said he would not jump through "hoops." In fact, Plaintiff was in the process of being diagnosed by VA doctors with PTSD, so it makes no sense why he would say he wasn't going to jump through hoops, when he had already started the process with the VA. Days later and due to the following stressful events, Plaintiff made appointments with his doctors to manage his PTSD and get sleep medication.

COMPLAINT FOR DAMAGES - Page 45

221.    Plaintiff texted on September 14, 2023 at 9:24 am "Seeing how today is going, I have reached out for child care, but don't have that covered yet. I will see if I can find an alternative. Kevin says we need to remove this 46-1 from PRO and he'll replace it with a trailerable one. Can you please rearrange my CRO accordingly?"

222.    Plaintiff got a text message two minutes later at 10:06 am on September 14, 2023 from Lacey Wesson saying *"*It is mandatory that you complete all of your assigned work today. Your dispatches should be doable. We cannot accommodate you leaving before all of your work is completed." Plaintiff texted "Still seems like I'm screwed, though ☹ What if maybe I interrupt the trailer run to use the 46 that we were going to take back to the yard for that swap and then maybe have time? Even then I just don't think it looks like there's enough time."

223.    Lacey Wesson texted at 12:12 pm, "I moved the Auburn to Wayne because he needs another dispatch. Let me know as soon as you're back to the yard because I may have something local for you to do. I hope this ends the discussion on how you are to prepare for Woodinville transfers as this day has not been pursued successfully or efficiently. Please follow Kevin's instructions regarding staging for transfers from now on – this is not negotiable. I also still need your breakdown from yesterday please."

224.    On September 14, 2023 at 1:07 pm, Plaintiff texted "Jasmine needs a tare weight on the replacement bin."

225.    Lacey Wesson's write up dated September 14, 2023 states, "I spoke with Ely again for his end of day call. After asking him three times today to send me a breakdown of yesterday's movements, he refused.

COMPLAINT FOR DAMAGES - Page 46

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

226.    He said he doesn't understand why I need it and what I'm looking for even though we had a discussion about it this morning. We had another discussion regarding why he only got two dispatches done during a full day with overtime yesterday. He reteaped the same delays, both of which did not come close to making up for so much lost time. I told him htat his first communication regarding delays to me yesterday was at 10:45am and asked him what he had been doing for the previous six hours besides one very short dispatch. He did not have an answer and replied with "I don't know" I expressed again that not only was yesterday unacceptable, it bled into today in which he was also unsuccessful in completing all of his dispatches because he did not follow Kevin's instructions. His other excuses for time lost were stress and conversations with people. . . He ended the conversation by stating that he has cameras in his truck that watches what he does all day so he's not worried about it." Indeed, if there were actually problems with what Plaintiff was doing during the day, his supervisors could have looked at his truck camera.

227.    On September 15, 2023 at 8:04 am, Plaintiff texted "No Concrete Tech to grab, and looks like Safari has almost no delay with moving stuff so I can grab their bins, so pretty on schedule so far." Lacey Wesson texted "Okay, great!"

228.    Late on Friday September 15, 2023, Plaintiff looked at the CRO system to see what his dispatches were the following Monday and it had him assigned to go to JBLM on September 18, 2023. Plaintiff was distressed. After he saw he was assigned to JBLM again, Plaintiff wrote an email to Taylor Munson and cc'd the Union representative Nick Lansdale on Friday September 15, 2023 at 5:02 pm pleading with them to not make him go to JBLM on Monday and stated "I have been refused on this multiple times over many months and have

COMPLAINT FOR DAMAGES - Page 47

1  become more insistent and deliberate about my requests over time. I am in no uncertain terms

2  asking for help, again." Plaintiff's email states:

3        Hello Nick and Hello Taylor,

4        With considerable trepidation, I am writing to follow up and hopefully help collaborate on a soluation
       to a problem that hopefully works for everybody. I look at the schedule for Monday and it says that I
       am scheduled to go to JBLM. I have asked Taylor to take me off of truck runs to JBLM because of stress
5        and anxiety related to my War Veteran status.

6        As I've communicated to Taylor, Kevin, and even Lacey in dispatch, my work in military service
       included some dark and difficult times. Often, exposure to JBLM produces dark and difficult times all
       over again. Especially with the gate pass failures we've had, these difficulties are compounded by the
7        added length of exposure going through the Logistics Gate truck inspection and backgrounding process,
       which sometimes take hours. When I go to JBLM it can take 4 hours with me stuck at a checkpoint. This
8        is a problem because when I was in the Army, I was in combat going through the same kinds of
       checkpoint procedures – armed guards and soldiers in full tactical gear, military working dogs,
9        undercarriage mirror scans, and a lengthy paperwork process for the federal background clearance that
       is required … and compare that experience to what a military checkpoint looks like in a combat zone.
       Indeed, where your fellow soldiers have been ambushed, wounded, killed…
10
       Rationally, I know that JBLM is not a combat zone, despite going through the gauntlet that is a gate
11       process, and the armored vehicles, rotary wing aircraft buzzing overhead, and so on…

12       Now tell my lizard brain, my survival instincts and my body that.

13       Now, all I am asking is that we try to find something that works for everybody in this instance – this is
       the first job I have ever had where I'm so likely and so often to confront this type of situation.

14       I have been refused on this multiple times over many months and have become more insistent and
       deliberate about my requests over time. I am in no uncertain terms asking for help, again.

15       I've been told that I must jump through some hoops to be given consideration here. However, I am a
       Combat Veteran, which was declared and proven in the hiring process, and there are certain presumed
16       realities that go along with that.

17       Please consider that I have JBLM placed on my routing for Monday. Please consider that I am asking
       for relief – again and again.

18       With respect. I hope to hear from you soon.

19       229.    On Sunday September 17, 2023 at 12:44 pm, Plaintiff texted his supervisors "I

20  have medical appointments the next couple days. Monday, Sept 18 1:30pm onward. Tuesday,

21  Sept19 10am--12pm."

22

23

COMPLAINT FOR DAMAGES - Page 48

230.    On Monday September 18, 2023 at 8:15 am, Taylor Munson forwarded Plaintiff's email to John Beix and Eric Hyman and said "I received this email from Ely on Friday afternoon. When I checked his dispatches for Monday, he did not have any JBLM runs on his route."

231.    On September 18, 2023 at 9:13 am, Taylor responded to Plaintiff's email stating:

Hi Ely,

We do not have you scheduled for JBLM runs this week. In the interim we will be taking you off JBLM runs to give you extra time to complete the ADA accommodation process.

Please understand, it is a company policy that you go through the ADA process for accommodation requests with our HR representative John Beix. . .

I have also asked John Beix to please reach out to you so we can get the ADA process started and completed in a timely manner.

232.    Taylor's email was trying to make it seem like Plaintiff was making up the fact that JBLM had been put on his schedule, make it seem like it was Plaintiff who was the problem, and that Plaintiff was delaying the ADA accommodation process. Nothing was further from the truth.

233.    On September 18, 2023 at 11:06 am, Plaintiff emailed Taylor, the Union and John Beix,

Taylor,

Respectfully, the fact is that I have been asking you guys for months to not put JBLM on my schedule because of how it affects me as a veteran. Thursday was the first time you have mentioned an ADA process or given me an HR contact. Last week was just the most recent example. Last week I was put on the JBLM schedule again for Tuesday 9/12. I was redirected by the guards to go through the JBLM truck inspection - it took me something like 40 minutes, instead of 40 seconds through the regular gate, to go through truck inspection. Often, truck inspection takes way longer. Hours.

You said you didn't understand why my badge wasn't working to get me through the faster gate when everyone's else's was. I told you the same day that going to JBLM was bad for me because I'm a veteran and asked to be deselected. And then, even though I had asked you to deselect me from JBLM, and even though you knew that my badge doesn't work, I was again put on JBLM for Monday (today). On Friday, after I saw that JBLM was on my schedule again for Monday, that is when I sent you and Nick

at the union an email. Only after CC'ing the union representative did you remove JBLM from my schedule or mention anything about an ADA process or who to contact.

234.    On Monday September 18, 2023 at 12:13 pm, Taylor Munson emailed Plaintiff and Nick Lansdale claiming that what Ely had seen was never there:

Hi Ely,

We do not have you scheduled for JBLM runs this week. In the interim we will be taking you off JBLM runs to give you extra time to complete the ADA accommodation process.

Please understand, it is a company policy that you go through the ADA process for accommodation requests, with our HR representative John Beix. John @ 503-314-0580 or jbeix@rdus.com.

I have also asked John Beix to please reach out to you so we can get the ADA process started and completed in a timely manner.

Thank you,

Taylor Munson

235.    One hour after Plaintiff sent the email above to Schnitzer HR and the Union representative stating he had already been asking for an accommodation for months, Taylor and Kevin brought Plaintiff into a meeting at 12:30 pm on where they wrote Plaintiff up for causing "major delays." As stated above, the write ups contained pretextual allegations in response to Plaintiff's email to HR and the Union.

236.    The Employee Warning Notification write up alleged that Plaintiff "refused to provide our dispatcher Lacey with a detailed breakdown of work delays for 9/13/2023." However, as shown above, Plaintiff had provided numerous updates to Lacey Wesson in Dispatch, the team, and Taylor Munson via text message throughout the day and Lacey Wesson in Dispatch had stated it was a light day and she would give dispatches as they came in. Plaintiff checked in with her before he left for the day.

237.    Plaintiff had spoken with Kevin McIntosh only for a few minutes at the end of the day on September 13, 2023 and all that Kevin McIntosh told him was that a few minutes

COMPLAINT FOR DAMAGES - Page 50

might be saved if he preloaded his truck and left it at the Rhine Yard. He also told Plaintiff it was ok to just do the paperwork. Plaintiff told Kevin it might be a violation of EPA environmental regulations because it would require a loaded truck to be stored at the Rhine Yard. Plaintiff also knew that the suggestion wasn't something that would make much of a difference time wise. Kevin McIntosh shrugged and said goodnight.

238.    In the long disciplinary meeting where Ely was being scolded over and over again, Taylor told Plaintiff, "if Kevin or Lacey tell you to do anything, that's an order." Ely responded by saying he's not in the military and he doesn't do that kind of work anymore, but he agreed to follow instructions. Taylor Munson repeated himself and said "No, it's an order and you will follow orders." Taylor Munson was deliberately using Plaintiff's status as a military veteran against him. They told Plaintiff people were afraid of him. Kevin McIntosh also told Plaintiff "Yeah, I understand you're stressed out by some of this stuff lately, like 'shell shocked' or whatever but… oh, sorry, bad choice of words…" This statement was a purposeful and offensive reference to Plaintiff's disability and military history.

239.    These interactions and references to the military and his PTSD in disciplinary meetings were so distressing and outrageous that Plaintiff could not return to this environment. He did not feel safe there. The exhaustion of having to explain every detail of his day, to fight to not go to JBLM, defend himself from his supervisors unwarranted attacks and reprimands referencing the military and mental health was too much for anyone to handle.

240.    All of Defendant's conduct caused Plaintiff to suffer severe mental anguish resulting in physical symptoms. Plaintiff was not sleeping and it was not safe for him to go to work. Plaintiff went on Washington Paid Medical Leave in order to manage his PTSD

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

symptoms. He had no choice but to quit his job because he could not go back to that environment and was constructively discharged.

## IV.    FIRST CAUSE OF ACTION

### Veteran Status Discrimination/Hostile Work Environment
### WLAD RCW 49.60, *et seq.*

241.    Plaintiff restates, realleges and incorporates by reference all previous paragraphs above as if fully set forth herein.

242.    Under Washington's Law Against Discrimination ("WLAD") RCW 49.60, it is unlawful for any employer to discharge or discriminate against any person in compensation or other terms or conditions of employment because of their status as an honorably discharged veteran or military status.

243.    Plaintiff qualifies as an "honorably discharged veteran" (hereinafter referred to as a "veteran") under WLAD because he was released from active duty and received a United States department of defense discharge document DD-214 that characterizes his service as honorable. (RCW 49.60.040(15).)

244.    Under WLAD, an "employer" includes any person acting in the interest of an employer, directly or indirectly. Therefore, Defendant Radius/Schnitzer is liable for the acts and omissions of its supervising employees, including, but not limited to Taylor Munson, Kevin McIntosh, and Lacey Wesson.

245.    Defendant Radius/Schnitzer is liable under the Washington Law Against Discrimination for the harassing conduct of its supervisors, agents and employees, and in creating a hostile work environment for Plaintiff on the basis of his status as an honorably discharged veteran and person with a disability.

COMPLAINT FOR DAMAGES - Page 52

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

246.    Defendant Radius/Schnitzer has imputed liability for the hostile work environment created by its agents and employees under the Washington Law Against Discrimination by failing to take prompt, appropriate remedial action in violation of RCW 49.60.180.

247.    Defendants Taylor Munson, Kevin McIntosh and Lacey Wesson are also liable for the hostile work environment they created.

248.    The facts alleged herein establish that Defendant's language and conduct about his status as a veteran created a hostile work environment for Plaintiff.

249.    The comments and conduct were unwelcome, undesirable, and offensive and Plaintiff did not solicit or incite it. The conduct and language was so offensive or pervasive that it altered the conditions of Plaintiff's employment.

250.    Plaintiff's supervisors, Defendants Taylor Mason, Kevin McIntosh, and Lacey Wesson participated in the conduct and language and Plaintiff's supervisors knew about conduct or language. Defendant failed to take reasonably prompt and adequate corrective action reasonably designed to end it; or management should have known of this harassment because it was so pervasive and Defendant failed to take reasonably prompt and adequate corrective action reasonably designed to end it.

251.    The language and conduct alleged herein and the following examples of harassment created a hostile work environment for Plaintiff because of his status as an honorably discharged veteran:

a.    Defendant Taylor Munson assigned Plaintiff two additional supervisors, Kevin McIntosh and Lacey Wesson, to further micromanage, monitor and place

COMPLAINT FOR DAMAGES - Page 53

Plaintiff under a microscope of scrutiny. He told Plaintiff they were his defacto supervisors and to do anything they said that wasn't illegal or immoral, even after Plaintiff told him about their discriminatory conduct.

b.  Defendant Kevin McIntosh told Plaintiff "NO COMBAT MODE" in driver evaluation that was given to Human Resources and told Plaintiff "this isn't going anywhere anyway. No one is ever going to see this."

c.  Defendant Kevin McIntosh asked Plaintiff if he had ever killed anyone in combat;

d.  Defendant Kevin McIntosh told Plaintiff that Chad Felix had said "I don't know what he's going to do!" and it was because "considering his history" . . . "considering you were in the service, being a war vet and all that."

e.  Defendant Taylor Munson used military terms with Plaintiff like "that's an order and you will follow orders!"

f.  Defendant Kevin McIntosh told Plaintiff "Yeah, I understand you're stressed out by some of this stuff lately, like 'shell shocked' or whatever but… oh, sorry, bad choice of words…"

g.  Defendant Kevin McIntosh use the phrase "suicide lane" when talking to Plaintiff;

h.  After Plaintiff asked to not be sent to JBLM because of his experience as a combat veteran, Defendant asked Plaintiff, **"if you ask not to go to JBLM, what's to stop all of us from asking not to go?"**

COMPLAINT FOR DAMAGES - Page 54

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

i.    On May 4, 2023, Chad Felix forgot to end the call with Plaintiff and he overhead a conversation between Chad Felix and Kevin McIntosh where Chad Felix said "this dipshit . . . . . dumb mutherfucker thinks he's special . . . every day it's something new with this guy."

j.    In June 2023, in response to Defendant Lacey Wesson's, request for his personal information for a JBLM pass, Plaintiff responded "I respectfully decline." She texted back, "are you being serious?" Plaintiff explained Plaintiff told her "While in the Army, I did a lot of dark and difficult stuff for my country. I'm glad I did all that, but it's kind of a double-edged sword. . . JBLM is a dark and difficult place for me to go."

k.    Plaintiff complained about the discrimination he received from Kevin McIntosh and Chad Felix to Taylor Munson, but Taylor Munson did not address the discrimination.

l.    The day of a disciplinary meeting on July 26, 2023 where Plaintiff was reprimanded, Defendant Taylor Munson gave Plaintiff a military challenge coin and a couple of pride bracelets. Traditionally, a challenge coin bears an organization's insignia and is presented by commanders to a member of the unit to recognize special achievement or to honor individuals who have demonstrated outstanding service, leadership or dedication for going above and beyond. It seemed like Taylor Munson was mocking Plaintiff's military background by disciplining him and then giving him something ironically related to his military background.

COMPLAINT FOR DAMAGES - Page 55

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

m. On August 7, 2023, Plaintiff asked a question about JBLM badge because of his "war related stress and anxiety" where "hadn't stepped foot on a military base the last 17 years for a reason" and Defendant Taylor Munson told Plaintiff if he refused to go, he would notify HR and the Union, threatening his job. Even after Plaintiff said he would handle it so he wouldn't get written up, Taylor Munson emailed HR thirty minutes later characterizing Ely's behavior as a "challenge," not wanting to following instructions and challenging directions given to him. If Ely does not want to complete a task assigned to him the perception is he will call out or come up with a reason why he cannot complete a task. I will continue to monitor. . . Our lead union driver and I had a sit-down discussion/coaching with Ely on 7/26/23 @ 11am to discuss performance concerns. We discussed Communication, Attendance, following instructions, being a team player and filling out paperwork correctly. Taylor then emailed Plaintiff saying he was there to "help in any way that I can," which was obviously false because Taylor Munson continued forcing Plaintiff to go to JBLM.

n. Defendants constructively discharged Plaintiff, which is an adverse employment action. The combination of all of the negative and false allegations herein referencing Plaintiff's veteran status, ignoring his requests to not go to a military base, mischaracterizing his war related trauma and not wanting to get a pass to a military base as "not wanting to follow instructions," culminated in a final and explosive disciplinary meeting where his supervisors invoked his military status and issued "orders" that he was told to follow or he would be fired. They told

COMPLAINT FOR DAMAGES - Page 56

Plaintiff people were afraid of him. All of Defendants' unlawful and discriminatory conduct caused Plaintiff to suffer severe mental anguish resulting in additional physical symptoms, which constructively discharged Plaintiff.

o.  Defendant advertises itself as a veteran friendly company and claims to actively promote veteran inclusion in their workforce. Defendant's failure to train and supervise its employees in non-discrimination practices related to disabled veterans is reprehensible and is an adverse employment action. This training should include how to identify and prevent discrimination in the workplace, make veteran employees feel safe, recognizing unconscious bias, avoiding microaggressions, understanding federal and state laws that prohibit discrimination, and teaching supervisors how to prevent discrimination.

252.  Plaintiff has suffered and continues to suffer economic damages, severe emotional distress, embarrassment, humiliation, and mental anguish as a direct result of Defendants' unlawful behavior and conduct related to his veteran status.

253.  As a direct and proximate result of the above-described unlawful behavior and conduct, Plaintiff Ely Crawford has sustained injuries and damages, both past and future, for pain and suffering, emotional distress, humiliation, mental anguish, anxiety, adverse physical and/or debilitating symptoms and conditions, loss of enjoyment and quality of life, loss of earnings, loss of employment benefits, diminished earning capacity, medical and psychological treatment expenses, reasonable attorney fees, and other damages in an amount to be proven at the time of trial. RCW 49.60.030(2).

COMPLAINT FOR DAMAGES - Page 57

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

254.    As a direct and proximate result of the above-described unlawful behavior and conduct, Plaintiff Aimee Crawford has sustained injuries and damages, including but not limited to loss of happiness, loss of companionship, loss of consortium, loss of love, and loss of enjoyment of life, in an amount to be proven at the time of trial.

## V.    SECOND CAUSE OF ACTION

### Veteran Status Discrimination /Disparate Treatment
### WLAD RCW 49.60, *et seq.*

255.    Plaintiff restates, realleges and incorporates by reference all previous paragraphs above as if fully set forth herein.

256.    The facts set forth herein state a claim against Defendants for disparate treatment discrimination based on Plaintiff's status as an honorably discharged veteran in violation of the Washington Law Against Discrimination. RCW 49.60, *et seq.*

257.    Defendant took the adverse actions described herein against Plaintiff and his status as a veteran was a substantial factor in Defendant's decision to take those adverse actions. Substantial factor under disparate treatment discrimination means a significant motivating factor in bringing about the employer's decision. "Substantial factor" does not mean the only factor or the main factor in the challenged act or decision.

258.    An adverse employment action is one that materially affects the terms, conditions or privileges of employment. Defendants took the adverse actions described herein against Plaintiff and his status as a veteran was a substantial factor in Defendant's decision to take those adverse actions. The adverse actions include all of the derogatory language and comments listed herein and under hostile work environment. A hostile work environment is

COMPLAINT FOR DAMAGES - Page 58

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

considered an adverse employment action under disparate treatment discrimination under WLAD.

259.    Defendants treated Plaintiff less favorably than the two similarly situated drivers outside his protected class and were not veterans, Chad Felix and Wayne Qualls.

260.    When Wayne Qualls was disciplined with a written warning, his meetings lasted 5 minutes and did not go beyond his working hours. Defendants provided Wayne Qualls with an explanation of what the write up was about, but was let go a few minutes later. They did not shout "orders" at him. When Defendants disciplined Plaintiff, they kept him in meetings that lasted more than an hour and sometimes brought him back into the office on another day for multiple meetings about the same write up. They would repeat the same things over and over and would not listen to Plaintiff or respond to his request for an appeal. Defendant Taylor Munson shouted "orders" at Plaintiff.

261.    Chad Felix was a driver on Plaintiff's team of 4 drivers who had out of control behavior problems, but Defendants didn't do anything to stop his explosive behavior. Chad would frequently yell, argue, swear, challenge directions, and stomp around, but was not disciplined. Plaintiff did not yell or shout, but was disciplined for "behavior problems."

262.    One of Plaintiff's first interactions with Chad Felix involved Kevin McIntosh telling Plaintiff, I want you to see what Chad is like. "Go ask Chad to see if he can do this run." Plaintiff took the piece of paper and gave it to Chad. Chad told Plaintiff, "No way man, I'm not doing that, I've already got my runs for the day. This is bullshit, fuck you." Plaintiff told him "But that's what Kevin told you to do." Chad replied, "No fuck you." Plaintiff could see what Kevin was talking about.

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

263.    Taylor Munson has said the following about Chad Felix: "Chad gets overwhelmed." "Chad is Chad." "Don't talk about Chad." "It can be hard to be work with Chad because it can be hard to get Chad on board." Plaintiff was often criticized for behaving the way Chad Felix actually behaved.

264.    Kevin McIntosh has said the following about Chad Felix: Chad doesn't follow directions and loses his shit. If Chad is given too little work, he drags it out. He's on the lugger because the Company wants consistency. It's a smaller truck Class B single drive axle and it's easier to get things done. (Plaintiff on the other hand was given a rolloff truck which is a lot bigger and is slower and takes longer to do everything).

265.    Kevin McIntosh told Plaintiff that Chad doesn't like complicated problems or hauling freight, or hitting docks, and working with people stresses him out. Kevin McIntosh told Plaintiff early on that "trying to work with Chad is difficult and I want to try and help Chad get better and fix some of this shit that is causing problems, but I don't want to put him under stress. He has a handgun and I'm worried Chad might become unstable and come undone and come to work with a gun or something. "I don't want him to come to work and blow people away." Kevin McIntosh said "I'm fucking done with Chad. He drinks like a fish after work and goes ballistic on me." Chad has said "why does everything have to be a word problem?"

266.    Chad would get into arguments with all of the drivers, Kevin McIntosh, Wayne Qualls and Plaintiff about how to get things done. He liked to be left alone, woulnd't do things the right way. He would argue back with Kevin. With Taylor, he would just listen.

267.    If there was an issue and Chad disagreed or was not able to do things his way, the next day Chad wouldn't come into work with no notice. He was not written up to Human

COMPLAINT FOR DAMAGES - Page 60

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

Resources. When Plaintiff took time off and told his supervisors the day before, he was disciplined in lengthy meetings and written up to HR for taking PTO and "attendance" issues.

268.    Plaintiff has suffered and continues to suffer economic damages, severe emotional distress, embarrassment, humiliation, and mental anguish as a direct result of Defendants' unlawful behavior and conduct related to his status as a person with a sensory and mental disability.

269.    As a direct and proximate result of the above-described unlawful behavior and conduct, Plaintiff Ely Crawford has sustained injuries and damages, both past and future, for pain and suffering, emotional distress, humiliation, mental anguish, anxiety, adverse physical and/or debilitating symptoms and conditions, loss of enjoyment and quality of life, loss of earnings, loss of employment benefits, diminished earning capacity, medical and psychological treatment expenses, reasonable attorney fees, and other damages in an amount to be proven at the time of trial. RCW 49.60.030(2).

270.    As a direct and proximate result of the above-described unlawful behavior and conduct, Plaintiff Aimee Crawford has sustained injuries and damages, including but not limited to loss of happiness, loss of companionship, loss of consortium, loss of love, and loss of enjoyment of life, in an amount to be proven at the time of trial.

## VI.    THIRD CAUSE OF ACTION

### Disability Discrimination/Hostile Work Environment
### WLAD RCW 49.60, *et seq.*

271.    Plaintiff restates, realleges and incorporates by reference all previous paragraphs above as if fully set forth herein.

COMPLAINT FOR DAMAGES - Page 61

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

272.    Washington's Law Against Discrimination makes it unlawful for any employer to discharge or discriminate against any person in compensation or other terms or conditions of employment because of their status as a person with any sensory, mental, or physical disability.

273.    Under the WLAD, a disability is any sensory, mental, or physical disability that is medically recognized or diagnosable or exists as a record or history or is perceived by the employer to exist, whether or not it exists in fact. A disability may exist whether it is temporary or permanent, common or uncommon, mitigated or unmitigied, whether or not it limits the ability to work generally or work at a particular job, or whether or not it limits any other activity.

274.    Plaintiff is a person who suffers from multiple disabilities that actually exist, have been documented, and were perceived by his "employer" and Defendants to exist.

275.    Defendants knew or should have known based on numerous conversations, text messages, emails, and their observations of Plaintiff that Plaintiff suffered from a disability.

276.    Defendants harassed and allowed other employees to harass Plaintiff because of his status as a person with a known or perceived disability, which resulted in a hostile work environment. That treatment combined with the exposure to the military base created a hostile work environment that caused Plaintiff to develop mental and physical disability symptoms and caused his constructive discharge.

277.    Under WLAD, an "employer" includes any person acting in the interest of an employer, directly or indirectly. Therefore, Defendant Radius/Schnitzer is liable for the acts and omissions of its supervising employees, including, but not limited to Taylor Munson, Kevin McIntosh, and Lacey Wesson.

278.    Defendant Radius/Schnitzer is liable under the Washington Law Against

COMPLAINT FOR DAMAGES - Page 62

Discrimination for the harassing conduct of its supervisors, agents and employees, and in creating a hostile work environment for Plaintiff on the basis of his status as a person with a known or perceived sensory, mental, or physical disability.

279.    Defendant Radius/Schnitzer has imputed liability for the hostile work environment created by its agents and employees under the Washington Law Against Discrimination by failing to take prompt, appropriate, remedial action in violation of RCW 49.60.180.

280.    Defendants Taylor Munson, Kevin McIntosh and Lacey Wesson are also liable for the hostile work environment they created because of Plaintiff's known or perceived disability.

281.    Plaintiff's supervisors, Defendants Taylor Mason, Kevin McIntosh, and Lacey Wesson participated in the conduct and language and Plaintiff's supervisors knew about conduct or language. Defendant failed to take reasonably prompt and adequate corrective action reasonably designed to end it; or management should have known of this harassment because it was so pervasive and they participated in the harassment, and Defendants failed to take reasonably prompt and adequate corrective action reasonably designed to end it, even after Plaintiff asked them to.

282.    The language and conduct alleged herein and the following examples of harassment created a hostile work environment for Plaintiff because of his status as a person with a known or perceived disability:

   a.    Defendants Kevin McIntosh and Taylor Munson told him that people were afraid of him because of the way he carried himself.

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

b. Plaintiff told Defendants about his PTSD symptoms and they used it to write him up for behavior problems and told him people were afraid of him.

c. While training with Chad, Plaintiff asked to get out of the truck. Kevin later told Ely that Chad had called him and said "He's not gonna follow the instructions … he's freaking me out … I don't know what he's gonna do." Kevin McIntosh said it was because of being a war vet and all that . . . and it was concerning considering his history, the way he carried himself and spoke with people. It was clear that the history Kevin was talking about was a reference to Plaintiff's military experience and implied that people were afraid of him because they thought his PTSD would make him violent. The same day on August 18, 2023, Taylor Munson and Kevin McIntosh gave Plaintiff a verbal warning for an alleged incident that occurred on August 17, 2023.

d. Defendant Lacey Wesson complained in a write up that Plaintiff was getting overtime even though he had called out sick.

e. As explained herein, Defendants did not provide Plaintiff with sick leave that was required under RCW 46.49 to be provided separately and recorded separately from accrued PTO. Defendants did not provide him with a balance of his sick leave in violation of RCW 46.49.

f. Defendant Taylor Munson told Plaintiff "the company does not provide sick time/pay. PTO is accrued," which is not accurate for Washington state under RCW 49.46.020.

COMPLAINT FOR DAMAGES - Page 64

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

g. On June 27, 2023, Plaintiff declined to get a ID badge for JBLM because "While in the Army, I did a lot of dark and difficult stuff for my country. I'm glad I did all that, but it's kind of a double-edged sword. JBLM is a dark and difficult place for me to go. Lacey presumably told or should have told Taylor Munson about this comment by a combat veteran not wanting to go to a military base because it was a dark and difficult time. Plaintiff was later written up for not following instructions.

h. Plaintiff told the team the evening before he would not be coming to work the next morning on Thursday June 29, 2023. On June 29, 2023 at 7:05 am, Taylor Munson texted Plaintiff "Your absence will be marked as not excused if you are not able to make it in tomorrow or Friday." Plaintiff responded, "Sorry sir, I'm just not feeling well. I really hope to be back tomorrow. What does "not excused" absence mean? Am I out of sick time?" At 7:55 am, Taylor Munson told Plaintiff "Hi Ely, Thank you for the update. If you are unable to make it in again tomorrow due to illness please make sure to provide a doctors note before returning back to work. I will give HR a heads up that you are reporting missed work due to illness today. The company does not provide sick time/pay. PTO time is accrued." Radius/Schnitzer did not allow Plaintiff to take his Washington paid sick leave that would have been available to him and Plaintiff was forced to come into work because of Defendant's failure to follow Washington law. This kind of retaliation is not allowed under the RCW 49.46. Because of Taylor's threatening comment, Plaintiff went to work sick on June 30, 2023. Kevin McIntosh texted Plaintiff "Cool working with you today

COMPLAINT FOR DAMAGES - Page 65

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

(Friday June 30, 2023). I could tell you weren't feeling to great. I appreciate your patience." Plaintiff responded "I woulda stayed out sick, but Taylor threatened "unexcused" absence, whatever that means. Wife and kids sick too, with one in & out of urgent care on Friday -- thus, all the update messages I was getting... not distracting at all."

i.    The same day Plaintiff texted Defendant Taylor Munson telling him about his anxiety and stress from going to the JBLM military base, that he was in contact with the VA, that he was in the process of being diagnosed, and highlighting how he was being treated, Kevin and Taylor brought Plaintiff into a second disciplinary meeting on August 22nd about the August 17th write up for 1.5 hours. Kevin and Taylor told Plaintiff this is part of a disciplinary escalation and if it continues, it will result in termination. Plaintiff was told after two write ups, he would lose his eligibility to receive a quarterly productivity bonus, which would have cost him approximately $1,000 every three months. He had received productivity bonuses every quarter previously. Taylor claimed in the meeting "I'm trying to protect you. The company is the one that would fire you."  The allegations were that Plaintiff had become argumentative and was not following instructions given to him by the Tacoma scale team the week before on August 17, 2023. Kevin later told Plaintiff believed Plaintiff that they had lied about the allegations in the scale house write up.

283.    The facts alleged herein establish that Defendant's language and conduct about his disability status created a hostile work environment for Plaintiff.

COMPLAINT FOR DAMAGES - Page 66

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

284.    The comments and conduct were unwelcome, undesirable, and offensive and Plaintiff did not solicit or incite it. The conduct and language was so offensive or pervasive that it altered the conditions of Plaintiff's employment, creating a hostile work environment.

285.    Plaintiff has suffered and continues to suffer economic damages, severe emotional distress, embarrassment, humiliation, and mental anguish as a direct result of Defendants' unlawful behavior and conduct related to his status as a person with person with a sensory and mental disability.

286.    As a direct and proximate result of the above-described unlawful behavior and conduct, Plaintiff Ely Crawford has sustained injuries and damages, both past and future, for pain and suffering, emotional distress, humiliation, mental anguish, anxiety, adverse physical and/or debilitating symptoms and conditions, loss of enjoyment and quality of life, loss of earnings, loss of employment benefits, diminished earning capacity, medical and psychological treatment expenses, reasonable attorney fees, and other damages in an amount to be proven at the time of trial. RCW 49.60.030(2)

287.    As a direct and proximate result of the above-described unlawful behavior and conduct, Plaintiff Aimee Crawford has sustained injuries and damages, including but not limited to loss of happiness, loss of companionship, loss of consortium, loss of love, and loss of enjoyment of life, in an amount to be proven at the time of trial.

## VII.    FOURTH CAUSE OF ACTION

### Disability Discrimination/ Disparate Treatment
### WLAD RCW 49.60, *et seq.*

288.    Plaintiff restates, realleges and incorporates by reference all previous paragraphs above as if fully set forth herein.

COMPLAINT FOR DAMAGES - Page 67

289.    Under the WLAD, a prima facie case of disparate treatment based on disability requires that the employee show (1) he has a disability; (2) he suffered an adverse employment action; (3) he was doing satisfactory work; and (4) he was treated differently than someone not a member of the protected class.

290.    The facts set forth above state a claim against Defendants for disability discrimination under WLAD for disparate treatment. RCW 49.60, *et seq.*

291.    As a direct and proximate result of the above-described unlawful behavior and conduct, Plaintiff Ely Crawford has sustained injuries and damages, both past and future, for pain and suffering, emotional distress, humiliation, mental anguish, anxiety, adverse physical and/or debilitating symptoms and conditions, loss of enjoyment and quality of life, loss of earnings, loss of employment benefits, diminished earning capacity, medical and psychological treatment expenses, reasonable attorney fees, and other damages in an amount to be proven at the time of trial. RCW 49.60.030(2)

292.    As a direct and proximate result of the above-described unlawful behavior and conduct, Plaintiff Aimee Crawford has sustained injuries and damages, including but not limited to loss of happiness, loss of companionship, loss of consortium, loss of love, and loss of enjoyment of life, in an amount to be proven at the time of trial.

## VIII.    FIFTH CAUSE OF ACTION

### Disability Discrimination/ Failure to Accommodate
### WLAD RCW 49.60, *et seq.*

293.    Plaintiff restates, realleges and incorporates by reference all previous paragraphs above as if fully set forth herein.

COMPLAINT FOR DAMAGES - Page 68

294.    The facts set forth above state a claim against Defendants for disability discrimination under WLAD for failure to accommodate. RCW 49.60, *et seq.*

295.    As a direct and proximate result of the above-described unlawful behavior and conduct, Plaintiff Ely Crawford has sustained injuries and damages, both past and future, for pain and suffering, emotional distress, humiliation, mental anguish, anxiety, adverse physical and/or debilitating symptoms and conditions, loss of enjoyment and quality of life, loss of earnings, loss of employment benefits, diminished earning capacity, medical and psychological treatment expenses, reasonable attorney fees, and other damages in an amount to be proven at the time of trial. RCW 49.60.030(2).

296.    As a direct and proximate result of the above-described unlawful behavior and conduct, Plaintiff Aimee Crawford has sustained injuries and damages, including but not limited to loss of happiness, loss of companionship, loss of consortium, loss of love, and loss of enjoyment of life, in an amount to be proven at the time of trial.

## IX.    SIXTH CAUSE OF ACTION

**Americans with Disabilities Act**
**Disability Discrimination – Hostile Work Environment**
**42 U.S.C. § 12111 et seq. (1990)**

297.    Plaintiff restates, realleges and incorporates by reference all previous paragraphs above as if fully set forth herein.

298.    Title I of the Americans with Disabilities Act of 1990 prohibits private employers with 15 or more employees from discriminating against qualified individuals with disabilities with regards to job application procedures, hiring, discharge, advancement,

COMPLAINT FOR DAMAGES - Page 69

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

1   compensation, job training, and other terms, conditions, and privileges of employment. 42

2   U.S.C. § 12111 et seq. (1990).

3       299.    A qualified individual employee with a disability may show ADA

4   discrimination by presenting evidence of a hostile work environment, disparate

5   treatment/impact, or by showing a failure to accommodate. (9th Circuit Manual of Model Jury

6   Instructions.)

7       300.    The term "qualified individual" means an individual with a disability who, either

8   with or without a reasonable accommodation, can perform the essential functions of the

9   employment position that such individual holds or desires. The individual must satisfy the

10  requisite skill, experience, education, and other job-related requirements of the employment

11  position.

12      301.    Plaintiff is a "qualified individual" under the ADA because he had a disability

13  or disabilities and proved through his work history, experience, performance, productivity, and

14  bonuses that he was able to perform the "essential functions" of working as a truck driver for

15  Defendant Radius/Schnitzer. He received several bonuses from Defendants for his productivity.

16      302.    The ADA defines a person with a disability as someone who satisfies one or

17  more of the following: (i) has a mental or physical impairment that significantly limits one or

18  more major life activities; (ii) has a history or record of such an impairment; or (iii) is perceived

19  by others as having such an impairment. (*Emphasis added*.)

20      303.    Plaintiff is considered disabled under the ADA because he is a qualified

21  individual who also satisfies two of the definitions of disability, numbers (i) and (iii) above.

22

23

COMPLAINT FOR DAMAGES - Page 70

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

Plaintiff has a mental or physical impairment that significantly limits one or more major life activities and is perceived by others as having such an impairment.

304.    Plaintiff's mental and physical impairments include, but are not limited to, psychological symptoms leading to physical/cognitive impairment, including PTSD, depression, acute stress disorder, general anxiety, social anxiety, trouble falling asleep and staying asleep, psychophysiological insomnia, hypervigilance, nightmares, avoidance, stress, increased heart rate, difficulty concentrating, and loss of interest in things he used to enjoy. Plaintiff was diagnosed with PTSD and other disabilities in 2023.

305.    Major life activities are the normal activities of living that a nondisabled person can do with little or no difficulty. Plaintiff's major life activities that were significantly limited by his mental and physical impairments included breathing, concentrating, talking, sleeping, caring for himself, communicating with others, and working.

306.    Plaintiff was diagnosed by his doctors as having PTSD and on December 13, 2023, the VA assigned Plaintiff a 70% evaluation for his PTSD by the Veterans Administration based on anxiety, chronic sleep impairment, difficulty in adapting to stressful circumstances, difficulty in adapting to work, disturbances of motivation and mood, inability to establish and maintain effective relationships, occupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress, and suspiciousness.

307.    Plaintiff meets the requirements of being "regarded as" having a disability. Plaintiff is a qualified individual (able to perform the essential functions of the employment position that Plaintiff held) who was discriminated against because of his actual or perceived

COMPLAINT FOR DAMAGES - Page 71

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

impairment. There is no requirement under "regarded as" disability for the impairment to limit or is perceived to limit a major life function. All the facts alleged herein establish that Plaintiff was "regarded as" having a disability or disabilities.

308.    As described and explained herein, Plaintiff told his supervisors Taylor Munson, Kevin McIntosh, and Lacey Wesson about his disability symptoms when they occurred verbally in person, over the phone, through text messages, and in emails.

309.    Plaintiff's supervisors and coworkers regarded Plaintiff as having an actual or perceived physical or mental impairment. After Plaintiff started going to JBLM more frequently and started exhibiting disability symptoms, Defendants thought there was something wrong with Plaintiff and talked about it frequently amongst themselves and reported his behavior to HR.

310.    An action is an adverse employment action if a reasonable employee would have found the action materially adverse, which means it might have dissuaded a reasonable worker from making or supporting a charge of discrimination.

311.    On June 29th, a series of adverse actions involved Defendants failing to provide Plaintiff with statutory sick leave benefits, telling Plaintiff the company did not provide sick leave benefits, telling Plaintiff they "will give HR a heads up that you are reporting missed work due to illness today," and told him if he was out the next day Plaintiff would have to provide a doctor's note with express purpose of intimidating Plaintiff to return to work. The Radius/Schnitzer Employee Handbook states if an employee is out for 3 or more days, they *may* need to provide a doctor's note, but the language in the Employee Handbook suggested that provision was for a situation like ensuring a contagious employee did not return to work

COMPLAINT FOR DAMAGES - Page 72

before a doctor cleared them, not as a method of proving or disproving the reason the employee was taking leave or to intimidate an employee to return sooner, which was Taylor's intention in texting Plaintiff the morning that Plaintiff was out sick. In fact, Taylor's message made Plaintiff so worried about Defendants' reaction that he came to work sick anyway the next day. Kevin acknowledged in a text message that Plaintiff did not look well. Plaintiff had a balance of available PTO during the pay period involving June 29th as well as the next pay period. Plaintiff would also have additional time for statutory sick leave if Defendants ever provided him with sick leave. This was around the same time that Plaintiff's disability symptoms were getting much worse due to his repeated exposure to JBLM and the military preparations for the July 4th airshow.

312.    On August 7, 2023 Taylor Plaintiff if he didn't go to JBLM, Taylor would have to report it to HR and the union. This is considered an adverse action under the ADA. '

313.    On Monday August 28, 2023, the same thing happened. Plaintiff was still feeling sick (he later found out he had COVID), but because he had been admonished for "calling out" and because he had been told "the company does not provide sick time/pay," Plaintiff was worried about being written up, so he went into work anyways.

314.    On August 25, 2023, Defendant Taylor Munson sent another email to HR saying "[Plaintiff] has mentioned on more than one occasion that his behavior issues are caused by PTSD and be thinks he has a VA claim that can be filed for PTSD and past military trauma. This was mentioned to our lead driver after our formal discussion on 8/18 and Ely has also sent this over via text message on 8/22."

315.    On September 8, 2023, Taylor Munson and Kevin McIntosh brought Plaintiff

COMPLAINT FOR DAMAGES - Page 73

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

into another long meeting where Kevin told him "people are afraid of approaching you, especially considering your history." They made it clear that their problem with Plaintiff was him being a veteran with disabilities. They told him that he wasn't going to get his quarterly productivity bonus because of his behavior.

316.    As alleged herein, on September 8, 2023, Taylor Munson sent an email to Human Resources stating Plaintiff did not have behavior issues when they first hired him and did a 6-week driver training with our lead driver with no behavior issues reported. This was of course before Defendants started dispatching Plaintiff, a combat veteran, to JBLM and before Plaintiff told Defendants he was having disability symptoms. Defendant observed that Plaintiff was suffering from numerous symptoms commonly associated with PTSD including "social anxiety," "not communicating," "ignoring team members," irritable "mad at the world attitude" and acknowledged that Plaintiff was applying for VA disability benefits. Defendant also appeared to be criticizing Plaintiff for appearing "exhausted" from having COVID recently. Defendant said there needed to be 100% improvement or "they will have no other choice than to move to a final warning."

317.    Plaintiff's disability was the reason why Defendants took the adverse actions alleged herein against the Plaintiff. Defendants referenced Plaintiff's PTSD symptoms in write ups, they told Plaintiff that people were afraid of him because of the way he held himself, they told him "no combat mode" and not to be so aggressive in evaluations. Defendants used specific terms in Plaintiff's write ups and conversations to match the disability symptoms that can present in someone with PTSD like "unhinged," "unprofessional," "making people uncomfortable," "troubling behavior," negative attitude, inability to communicate and "didn't

COMPLAINT FOR DAMAGES - Page 74

know what he was going to do" "because of being a war vet *and all that*." (*Emphasis added*.)

318.    Plaintiff asked Kevin to tell him where he was going wrong and to be specific on how he could change his behavior to avoid this onslaught, but there were no suggestions on how to improve. Kevin told Plaintiff he needed to "be a better team player." On September 8, 2023, Plaintiff texted Kevin asking for help identifying "if there are truly personality or behavioral issues that you think are [disability] related, or something like that, please help gather written testimony and help me document that for the VA." However, Kevin never responded or provided Plaintiff with additional details.

319.    On September 8, 2023, Taylor Munson emailed HR representative John Beix:

*Ely again was shocked to hear his behavior issues were continuing and said he is having some social anxiety,* feeling exhausted from being ill [from COVID] and just talking about our behavior expectations set for him is stressing him out. Ely said he has never had behavior issues at any other job, and he is seeking out support from the VA for PTSD. I also provided Ely with information for our LYRA Employee Assistance Program in case he would like to speak with someone for added support. Ely also mentioned the way he is acting is his personality, but I chimed in and said you did not have behavior issues when we first hired you and did a 6-week driver training with our lead driver with no behavior issues reported. All this week it was reported to me by our lead driver [Kevin McIntosh] that Ely's behavior was - mad at the world attitude, ignoring team members, not being a team player, not communicating Etc.

320.    Chad Felix told Kevin McIntosh that he was "worried about what [Plaintiff] might do."

321.    Kevin McIntosh told Plaintiff "no combat mode" in an evaluation. "Each time anything is addressed with Ely he becomes unhinged, and his behavior becomes unprofessional and is making the other drivers and dispatch very uncomfortable."

322.    Defendant and its agents also terms like "shell-shocked," "no combat mode," "suicide lane," "special," "dipshit," and "dumb motherfucker" when describing or talking to

COMPLAINT FOR DAMAGES - Page 75

1    Plaintiff.

2       323.    Defendant and its agents used specific terms in Plaintiff's write ups and

3    conversations to match the disability symptoms that can present in someone who has PTSD,

4    like "unhinged," "unprofessional," making people uncomfortable, troubling behavior, negative

5    attitude, inability to communicate, and "didn't know what he was going to do."

6       324.    While he was working for Defendant in 2023, Plaintiff told Defendants that he

7    was in the process of applying for VA disability benefits and told his supervisors that he applied

8    for benefits with the VA for his PTSD disability. This was repeated to his supervisors in a

9    disciplinary meeting conducted on August 18, 2023.

10      325.    Plaintiff sent a text message on August 22, 2023 at 6:04 am to Taylor Munson

11   saying he had initiated contact with the VA relating to his stress and anxiety around trips to

12   JBLM and social anxiety. Plaintiff stated he was in the initial stages of the VA assessment,

13   diagnosis, and investigation process.

14      326.    Defendant Radius/Schnitzer was aware of Plaintiff's disability and his disability

15   benefit application to the Veteran's Administration. They used this information in an email

16   dated August 25, 2023 to critique Plaintiff's "behavior issues." The email stated in part, "Ely

17   has mentioned on more than one occasion that his behavior issues are caused by PTSD and he

18   thinks he has a VA claim that can be filed for PTSD and past military trauma. This was

19   mentioned to our lead driver after our formal discussion on 8/18 and Ely has also sent this over

20   via text message on 8/22."

21      327.    Taylor Munson drafted an email to HR representative John Beix on August 25,

22   2023 stating "[Plaintiff] has mentioned on more than one occasion that his behavior issues are

23

COMPLAINT FOR DAMAGES - Page 76

caused by PTSD and be thinks he has a VA claim that can be filed for PTSD and past military trauma. This was mentioned to our lead driver after our formal discussion on 8/18 and Ely has also sent this over via text message on 8/22."

328.    "Each time anything is addressed with Ely he becomes unhinged, and his behavior becomes unprofessional and is making the other drivers and dispatch very uncomfortable."

329.    Plaintiff also told everyone on his team, including supervisors, that he had anxiety, stress, and was losing sleep over having to go to JBLM and had PTSD.

330.    Defendant was aware that Plaintiff had PTSD because Plaintiff's supervisor Taylor Munson told them, but they continued to send him to JBLM anyway.

331.    Another driver on the team who had a valid JBLM ID from a previous job and told Taylor Munson a few times to send him to JBLM instead of Plaintiff.

332.    Plaintiff also told everyone on his team, including supervisors, that he had anxiety, stress, and was losing sleep over having to go to JBLM. Plaintiff asked to not be sent to JBLM, but Defendant's agents did not listen. Defendant and its agents were aware that Plaintiff had PTSD because of his combat military experience, but they continued to send him to JBLM anyway.

333.    Conduct resulting from a disability is part of the disability and is not a separate basis for termination or other negative employment action. *See Gambini v. Total Renal Care, Inc.*, 486 F.3d 1087, 1093 (9th Cir. 2007).

334.    Defendant created a hostile work environment for Plaintiff by accruing the following adverse actions during his employment. Defendant reprimanded Plaintiff, subjected

COMPLAINT FOR DAMAGES - Page 77

him to slurs, made negative and derogatory comments about him, presented unwanted verbal attacks that were so severe that they hindered Plaintiff's work environment, denied Plaintiff paid sick leave benefits, made threats, intimidated Plaintiff, mocked him, gave unwarranted negative job reviews, ignored his verbal accommodation requests, and had created a working environment so toxic that it caused a constructive discharge of Plaintiff.

335.    Plaintiff's supervisors made working conditions so problematic and intolerable that a reasonable person in Plaintiff's position would be unable to remain at the job and had no alternative but to resign.

336.    Defendant's pattern of discriminatory behavior, including actions that created intolerable working conditions directly related to Plaintiff's disability, shows a clear link between his disability and Defendant's adverse actions. A reasonable person in Plaintiff's situation would feel compelled to resign due to these actions.

337.    The facts set forth herein state a claim for disability-based hostile work environment in violation of the ADA.

338.    The actions of Defendants Taylor Munson, Kevin McIntosh and Lacey Wesson are imputed to Defendant Radius/Schnitzer. Where an owner, manager, partner or corporate officer personally participates in the harassment, this element is met by such proof.

339.    Defendant Radius/Schnitzer's Fleet Safety Supervisor Taylor Munson is considered a manager, because he oversees safety practices within a fleet, which involves responsibility for monitoring compliance, training drivers, investigating incidents, and implementing safety initiatives, all of which are managerial functions.

COMPLAINT FOR DAMAGES - Page 78

340.    Managers are also those who have been given the authority and power by the employer to affect the hours, wages, and working conditions of the employer's workers.

341.    Defendant Taylor Munson gave authority to Kevin McIntosh and Lacey Wesson to be Plaintiff's supervisors and to do anything they said that wasn't illegal or immoral, allowing them to train and discipline Plaintiff, change his work hours, and change his work assignments.

342.    Taylor Munson, Kevin McIntosh, and Lacey Wesson were all managers because they affected Plaintiff's hours, wages, and working conditions.

343.    Taylor Munson and Kevin McIntosh both interviewed Plaintiff for the CDL-A driver position and hired Plaintiff on Defendant's behalf.

344.    Taylor Munson and Kevin McIntosh conducted disciplinary meetings with Plaintiff that they reported to Human Resources.

345.    Taylor Munson and Kevin McIntosh told Plaintiff once they wrote Plaintiff up 2 times, Plaintiff would lose his quarterly productivity bonus of approximately $1,000.

346.    From the beginning of Plaintiff's employment, Kevin McIntosh was responsible for training and supervising the other drivers and did ride-alongs with the drivers where he submitted evaluations to be placed in their personnel file with Human Resources.

347.    Taylor Munson told Plaintiff that a supervisor should be doing the ride-alongs, but he was too busy and wanted Kevin to do it.

348.    Kevin conducted team meetings every morning and also helped to discipline drivers on the team. He worked with Lacey Wesson in dispatch to create everyone's work schedules every day.

COMPLAINT FOR DAMAGES - Page 79

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

349.    Taylor Munson told Plaintiff Defendant Radius/Schnitzer does not provide sick leave and he did not allow Plaintiff to take Washington mandated sick leave.

350.    Taylor Munson, Kevin McIntosh and Lacey Wesson reported Plaintiff's absences to Human Resources.

351.    Lacey Wesson made the work assignments for the drivers and directed the drivers where to go every day, questioned what the drivers were doing hour to hour, and asked drivers for reports and updates about delays.

352.    Lacey Wesson participated in disciplining drivers, including Plaintiff. She was in control of their work schedules and would often text late at night to inform them of their dispatches for the next day. Lacey wrote a negative review of Plaintiff that she submitted to Human Resources for an alleged "incident" that occurred on September 13, 2023 when Plaintiff did not provide updates to her (Plaintiff provided dozens of updates as proven in text messages).

353.    Lacey Wesson complained in her written review of Plaintiff on or about September 14, 2023 that Plaintiff received overtime even though he called out sick.

354.    Defendant's Human Resources representative John Beix was informed by Taylor Munson, Kevin McIntosh and Lacey Wesson about "issues" they had with Plaintiff, including the fact that Plaintiff was a combat veteran who developed PTSD after he started working for Defendant.

355.    Defendant placed all of these employees in positions of trust in the company to oversee, monitor, and discipline other employees.

356.    All of these managers created a work environment that forced Plaintiff, a combat veteran employee, to be repeatedly exposed to a military base, caused him to develop a PTSD

COMPLAINT FOR DAMAGES - Page 80

disability, while subjecting him to demeaning slurs, shaming, and unwarranted discipline.

357.    These managers caused Plaintiff to question his own reality and increased his paranoia, further exacerbating his other PTSD disability symptoms. Their failure to appropriately respond to Plaintiff's multiple accommodate requests to not go to the military base created a hostile work environment for Plaintiff and their actions and inactions should be imputed to Defendant as its agents.

358.    Defendant Radius/Schnitzer failed to train their managers and supervisors in anti-discrimination practices, which directly harmed Plaintiff, causing him damages.

359.    Defendant Radius/Schnitzer failed to properly train its agents in how to manage and support subordinate employees who were combat veterans with mental health challenges.

360.    Defendant Radius/Schnitzer's failure to train its agents is especially evident because Plaintiff's supervisor admits to being aware Plaintiff is a combat veteran who did not have behavior issues before being dispatched to a military base who suddenly started developing behavior problems after being dispatched to a military base. After being told by that employee he is experiencing stress and anxiety and war related stress, does nothing to help. In fact, Defendant and its agents started closely monitoring Plaintiff's every move and were harassing him over conduct that was part of his disability.

361.    There were dozens of other customers Plaintiff could have been assigned to, but Defendant decided to continue sending Plaintiff to JBLM instead of another employee who was not a combat veteran, who was not disabled and who had a JBLM ID badge that worked every time.

362.    Plaintiff has suffered and continues to suffer economic damages, severe

COMPLAINT FOR DAMAGES - Page 81

1    emotional distress, embarrassment, humiliation, and mental anguish as a direct result of

2    Defendants' unlawful behavior and conduct.

3        363.    As a direct and proximate result of the above-described unlawful behavior and

4    conduct, Plaintiff Ely Crawford has sustained injuries and damages, both past and future, for

5    pain and suffering, emotional distress, humiliation, mental anguish, anxiety, adverse physical

6    and/or debilitating symptoms and conditions, loss of enjoyment and quality of life, loss of

7    earnings, loss of employment benefits, diminished earning capacity, medical and psychological

8    treatment expenses, reasonable attorney fees, and other damages in an amount to be proven at

9    the time of trial.

10        **X.    SEVENTH CAUSE OF ACTION**

11        **Americans with Disabilities Act**
     **Disability Discrimination – Failure to Provide a Reasonable Accommodation**
12        **42 U.S.C. § 12111 et seq. (1990)**

13        364.    Plaintiff restates, realleges and incorporates by reference all previous paragraphs

14    above as if fully set forth herein.

15        365.    The ADA treats the failure to provide a reasonable accommodation as an act of

16    discrimination if the employee is a 'qualified individual,' the employer receives adequate

17    notice, and a reasonable accommodation is available that would not place an undue hardship

18    on the operation of the employer's business.

19        366.    The facts set forth herein state a claim against Defendants for failure to provide

20    a reasonable accommodation in violation of the Americans with Disabilities Act. 42 U.S.C. §

21    12111 et seq. (1990).

22        367.    The accommodation process under the ADA is an interactive one that usually

23

COMPLAINT FOR DAMAGES - Page 82

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

begins when an employee asks for an accommodation at work because of their disability. The employee's request does not need to include the word "accommodation." The interactive process is a mandatory, not permissive, duty of the employer, and the employer even has a duty to initiate the interactive process in some circumstances.

368.    In this case, Plaintiff told his supervisors he was a combat veteran, was experiencing anxiety and PTSD symptoms, and expressed that he did not want to go to the military base in early 2023.

369.    Anxiety disorders are considered disabilities under the ADA.

370.    When a combat veteran employee tells his employer he is having stress and anxiety after going to and being detained at a military base for long periods of time, this should have caused Defendants to start the interactive accommodation process.

371.    PTSD and anxiety disorders cause problems with an employee's ability to communicate. That information combined with an employee's military service should have alerted Defendants to start the interactive process sooner.

372.    The EEOC's guidance on this issue states an individual may use "plain English" and need not mention the ADA or use the phrase "reasonable accommodation" when requesting an accommodation. Therefore, any time an employee indicates they are having a problem and the problem is related to a medical condition, the employer should consider whether the employee is making a request for accommodation under the ADA.

373.    The following examples are provided on the EEOC website:

Example A: An employee tells her supervisor, "I'm having trouble getting to work at my scheduled starting time because of medical treatments I'm undergoing." This is a request for a reasonable accommodation.

COMPLAINT FOR DAMAGES - Page 83

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

Example B: An employee tells his supervisor, "I need six weeks off to get treatment for a back problem." This is a request for a reasonable accommodation.

Example C: A new employee, who uses a wheelchair, informs the employer that her wheelchair cannot fit under the desk in her office. This is a request for reasonable accommodation.

Example D: An employee tells his supervisor that he would like a new chair because his present one is uncomfortable. Although this is a request for a change at work, his statement is insufficient to put the employer on notice that he is requesting reasonable accommodation. He does not link his need for the new chair with a medical condition.

https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada

374.    "Because many veterans may not view their service-related injuries as disabilities, they may not ask, or know that they are entitled to ask, for a reasonable accommodation. As a result, it may be critical for the employer to initiate a conversation with a veteran who is experiencing problems to determine an appropriate accommodation. Working together, the employer and veteran should identify what the veteran cannot do and then discuss ways to address any identified performance issue(s)."

https://www.eeoc.gov/laws/guidance/veterans-and-americans-disabilities-act-guide-employers

375.    It is clear that Defendants were not trained in and did not use any of these EEOC resources.

376.    Defendant Radius/Schnitzer was aware of or had reason to be aware that Plaintiff had a disability because of the symptoms Plaintiff reported when he went to the military base. Such awareness coupled with the knowledge that Plaintiff was a combat veteran should have triggered Radius/Schnitzer's duty to engage in the interactive process. The interactive process is a mandatory, not permissive, duty of the employer, and the employer has

COMPLAINT FOR DAMAGES - Page 84

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

1    a duty to initiate the interactive process in some circumstances when the employee has problems

2    communicating their need for an accommodation.

3        377.    In the very least, Defendants should have started the interactive accommodation

4    process with Plaintiff when he started writing down his requests in June 2023 he did not want

5    to go to a military base because of disability symptoms associated with being a combat veteran.

6    On June 27, 2023, in response to a request for his personal information to get a JBLM pass,

7    Plaintiff responded "I respectfully decline." Lacey Wesson texted back, "Are you being

8    serious?" Plaintiff explained "While in the Army, I did a lot of dark and difficult stuff for my

9    country. I'm glad I did all that, but it's kind of a double-edged sword. . . JBLM is a dark and

10   difficult place for me to go." Lacey Wesson was one of Plaintiff's supervisors and did not

11   properly respond to what she knew or should have known was Plaintiff's request for an

12   accommodation. This was not the first time Plaintiff asked to not be sent to JBLM, but after

13   this date, Defendants started micromanaging Plaintiff and equated his request with "behavior

14   problems."

15       378.    On August 7, 2023, Defendant Taylor Munson knew Plaintiff did not want to

16   go to JBLM because of his war related stress when Taylor threatened Plaintiff in a text exchange

17   about JBLM: "If we have a driver that is refusing scheduled/assigned work I would need to

18   notify radius HR and the union representative."

19       379.    Defendants did not make a good faith effort to engage in the interactive process

20   with Plaintiff. Plaintiff began the interactive process for an accommodation when he verbally

21   told his supervisors that he was experiencing PTSD symptoms as a combat veteran and did not

22   want to go to the base starting in March 2023. Every time he started talking about his symptoms

23

COMPLAINT FOR DAMAGES - Page 85                    **Law Office of Elizabeth Lunde**
                                                   6817 27th Ave West, #65454
                                                   University Place, WA 98466
                                                   Phone: (253)302-0136
                                                   Email: ELunde@LundeLegal.com

or how difficult it was for him to go to the base, Defendant either ignored him, told him it would be too hard on the company, or threatened to tell HR that he was refusing assigned work. In fact, starting on August 7, 2023, Defendant Taylor Munson started emailing HR that Plaintiff was "not wanting to following instructions and challenge directions given to him." This was in response to Plaintiff's requests to not go to the base because of his symptoms.

380.    Plaintiff would have gladly cooperated with an ADA process if that instruction had ever been given to him when he first asked for the accommodation. However, by the time Defendants offered the ADA accommodation process, Defendants had been actively harassing Plaintiff because of his disability status and Defendants constructively discharged Plaintiff. Defendants started the interactive process after Plaintiff had already asked numerous times, and the Defendants' failure to participate in the interactive accommodation process every time he asked had the effect of denying his request every time.

381.    Furthermore, an hour after Plaintiff emailed Taylor Munson and cc'd the Union and HR that he had been asking for an accommodation from him and Kevin for months, Taylor Munson and Kevin McIntosh retaliated against Plaintiff by bringing him into another unwarranted disciplinary meeting for "insubordination" with Taylor Munson shouting, "those are orders!" After that meeting, Kevin McIntosh told Plaintiff "Yeah, I understand you're stressed out by some of this stuff lately, like 'shell shocked' or whatever but… oh, sorry, bad choice of words…"

382.    At that point, Plaintiff could no longer work without taking medical leave and could not then return to the environment that had caused his disability.

383.    Any argument by Defendant that Plaintiff failed to complete their ADA

COMPLAINT FOR DAMAGES - Page 86

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

accommodation process is a blatant mischaracterization of the facts because it was Defendant's agents who failed to respond or intentionally ignored to Plaintiff's repeated accommodation requests for months. Plaintiff had already begun the interactive process and Defendant had a duty to respond to his requests. Defendants failed to continue the interactive accommodation process months before they finally did.

384.    If Defendants had responded to *any* of Plaintiff's requests with their "ADA accommodation procedure" *before* they sent him to JBLM more than 30 times, Plaintiff would not have suffered additional and severe emotional damages, which included a 70% disability rating with the VA for PTSD that was retroactive to July 25, 2023.

385.    Plaintiff had been told by Schnitzer that two written warnings would cause him to lose his bonus, which meant the 9/18/23 write up would have caused him to lose the following quarterly safety bonus of approximately $1,000. This caused Plaintiff a great deal of additional financial stress that added to his traumatic stress reaction to Defendants' discriminatory acts and omissions.

386.    Plaintiff has suffered and continues to suffer economic damages, severe emotional distress, embarrassment, humiliation, and mental anguish as a direct result of Defendants' unlawful behavior and conduct.

387.    As a direct and proximate result of the above-described unlawful behavior and conduct, Plaintiff Ely Crawford has sustained injuries and damages, both past and future, for pain and suffering, emotional distress, humiliation, mental anguish, anxiety, adverse physical and/or debilitating symptoms and conditions, loss of enjoyment and quality of life, loss of earnings, loss of employment benefits, diminished earning capacity, medical and psychological

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

1    treatment expenses, reasonable attorney fees, and other damages in an amount to be proven at

2    the time of trial.

3    ## XI.    EIGHTH CAUSE OF ACTION

4    ### Americans with Disabilities Act
     ### Disability Discrimination – Disparate Treatment/Impact
5    ### 42 U.S.C. § 12111 et seq. (1990)

6    388.    Plaintiff restates, realleges and incorporates by reference all previous paragraphs

7    above as if fully set forth herein.

8    389.    Disparate-treatment and disparate-impact claims are cognizable under the ADA.

9    390.    Under the ADA, using circumstantial evidence, a plaintiff may establish "a

10   *prima facie* case of discrimination by showing that (1) he is disabled under the ADA; (2) he

11   was meeting his employer's legitimate employment expectations based on the Essential

12   Functions of a Truck Driver CDL-A Job Description; (3) he suffered an adverse employment

13   action; and (4) similarly situated employees without a disability were treated more favorably.

14   391.    The facts set forth above state a claim against Defendants for disparate treatment

15   and disparate impact in violation of the Americans with Disabilities Act. 42 U.S.C. § 12111 et

16   seq. (1990).

17   392.    Plaintiff has suffered and continues to suffer economic damages, severe

18   emotional distress, embarrassment, humiliation, and mental anguish as a direct result of

19   Defendants' unlawful behavior and conduct related to his veteran status.

20   As a direct and proximate result of the above-described unlawful behavior and conduct,

21   Plaintiff Ely Crawford has sustained injuries and damages, both past and future, for pain and

22   suffering, emotional distress, humiliation, mental anguish, anxiety, adverse physical and/or

23

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

debilitating symptoms and conditions, loss of enjoyment and quality of life, loss of earnings, loss of employment benefits, diminished earning capacity, medical and psychological treatment expenses, reasonable attorney fees, and other damages in an amount to be proven at the time of trial.

## XII.    NINTH CAUSE OF ACTION

### Americans with Disabilities Act / Punitive Damages
### 42 U.S.C. § 12111 et seq. (1990)

393.    Plaintiff restates, realleges and incorporates by reference all previous paragraphs above as if fully set forth herein.

394.    A complaining party may recover punitive damages under the ADA against a Defendant if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.

395.    The facts set forth herein state a claim against Defendants for punitive damages because Defendants engaged in discriminatory practices with malice or with a reckless indifference to the federally protected rights of Plaintiff, which involved numerous violations of the Americans with Disabilities Act. 42 U.S.C. § 12111 et seq. (1990).

## XIII.   TENTH CAUSE OF ACTION

### Negligent and or Intentional Infliction of Emotional Distress
### Tort of Outrage

396.    Plaintiff restates, realleges and incorporates by reference all previous paragraphs above as if fully set forth herein.

397.    Defendants intentionally and/or recklessly caused Plaintiff severe emotional

Law Office of Elizabeth Lunde
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

1    distress by their extreme and outrageous conduct.

2        398.    Defendants' conduct as described herein constitutes negligent and/or intentional

3    infliction of emotional distress and/or outrage.

4        399.    The facts set forth herein state a claim of Outrage against Defendants.

5        400.    As a direct and proximate result of the above-described unlawful behavior and

6    conduct, Plaintiff Ely Crawford has sustained injuries and damages, both past and future, for

7    pain and suffering, emotional distress, humiliation, mental anguish, anxiety, adverse physical

8    and/or debilitating symptoms and conditions, loss of enjoyment and quality of life, loss of

9    earnings, loss of employment benefits, diminished earning capacity, medical and psychological

10   treatment expenses, reasonable attorney fees, and other damages in an amount to be proven at

11   the time of trial.

12       401.    As a direct and proximate result of the above-described unlawful behavior and

13   conduct, Plaintiff Aimee Crawford has sustained injuries and damages, including but not

14   limited to loss of happiness, loss of companionship, loss of consortium, loss of love, and loss

15   of enjoyment of life, in an amount to be proven at the time of trial.

16                        **XIV.    ELEVENTH CAUSE OF ACTION**

17                    **Loss of Consortium – Plaintiff Aimee Crawford**

18       402.    Plaintiff restates, realleges and incorporates by reference all previous paragraphs

19   above as if fully set forth herein.

20       403.    At all times relevant to the factual allegations herein, Plaintiffs were and are a

21   married couple.

22       404.    This Court has supplemental subject matter jurisdiction pursuant to 28 U.S.C.

23

COMPLAINT FOR DAMAGES - Page 90

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

§1367 over Plaintiff Aimee Crawford's Washington state law loss of consortium claim.

405.    As alleged herein, Plaintiff Ely Crawford suffered injuries as a result of Defendant's unlawful discrimination, harassment, hostile work environment, failure to accommodate, disparate treatment, disparate impact, and constructive discharge as Defendants' employee because of his status as an honorably discharged veteran and person with a known or perceived disability under the Washington Law Against Discrimination ("WLAD").

406.    Plaintiff Aimee Crawford's Loss of Consortium claim against Defendants are for her damages which occurred because of Defendants' injuries to her spouse Plaintiff Ely Crawford.

407.    Defendants' acts and omissions against Plaintiff Ely Crawford have caused Plaintiff Aimee Crawford to suffer loss of consortium damages, including loss of sexual relations, loss of companionship, and inability to contribute to household chores or care for their three minor children. The amount of Aimee Crawford's damages are ongoing and therefore are in an amount that will be proven at the time of trial.

## XV.    PRAYER FOR RELIEF

Wherefor, Plaintiff respectfully prays that this Court:

408.    Assume jurisdiction of this action;

409.    Award a judgment for economic damages to Plaintiff Ely Crawford in an amount to be proven at trial, including medical expenses, front pay and back pay, and unpaid sick leave;

410.    Award a judgment for non-economic damages to Plaintiff Ely Crawford in the amount of $5,000,000.00 to be proven at trial.

COMPLAINT FOR DAMAGES - Page 91

**Law Office of Elizabeth Lunde**
6817 27th Ave West, #65454
University Place, WA 98466
Phone: (253)302-0136
Email: ELunde@LundeLegal.com

1    411.    Award a judgment of punitive damages to the extent authorized by law, in the

2    amount of $20,000,000.00;

3    412.    Award a judgment for non-economic damages to Plaintiff Aimee Crawford in

4    an amount to be proven at the time of trial;

5    413.    For reasonable attorney's fees and costs subject to 42 U.S. Code § 12205;

6    414.    For reasonable attorney's fees and costs subject to RCW 49.60.030(2);

7    415.    For a trial by jury.

8    416.    For such other and further relief as the Court deems just and proper.

9
      DATED on January 27, 2025.
10

11
                                            /s/ Elizabeth G. Lunde
12                                          Elizabeth G. Lunde, WSBA No. 51565
                                            Of Attorneys for Plaintiffs
13                                          6817 27th Ave West, # 65454
                                            University Place, WA 98466
14                                          Telephone: (253)302-0136
                                            Email: ELunde@LundeLegal.com
15

16

17

18

19

20

21

22

23

COMPLAINT FOR DAMAGES - Page 92          **Law Office of Elizabeth Lunde**
                                         6817 27th Ave West, #65454
                                         University Place, WA 98466
                                         Phone: (253)302-0136
                                         Email: ELunde@LundeLegal.com